Betty **JACKSON**, Appellant,

and

Frank Ray Jackson, Plaintiff,

v.

Nicholas **PANTAZES**; Officer Allan Goldberg; Appellees,

and

Montgomery County, MD, Defendant.

No. 86–3539.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1986.

Decided Jan. 30, 1987.

Neil D. Goldman (H. Alan Young, Young & Goldman, Washington, D.C., on brief), for appellant.

Judith R. Catterton (Catterton, Kemp & Mason on brief); James M. Peelman, Asst. Co. Atty. (Paul A. McGuckian, Co. Atty., Bruce P. Sherman, Sr. Asst. Co. Atty., Rockville, Md., on brief), for appellees.

Before WINTER, Chief Judge, BUTZNER, Senior Circuit Judge, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

HARRISON L. WINTER, Chief Judge:

Plaintiff Betty Jackson filed this suit against bail bondsman Nicholas Pantazes and police officer Allan Goldberg under 42 U.S.C. § 1983. Mrs. Jackson alleged that defendants caused personal injury and property damage when they forcibly entered her home in search of her son, Frank, who had failed to appear in court in two scheduled criminal cases.[1] The district court granted summary judgment for defendants. It ruled that Pantazes was not a state actor so as to render him liable under § 1983. It further ruled that Officer Goldberg did not instigate, and was not otherwise at fault with regard to, the use of excessive force alleged by plaintiff.

We hold that Pantazes was a state actor and that Officer Goldberg may be liable under § 1983 by reason of his participation in Pantazes' alleged deprivations of plaintiff's constitutional rights. We reverse the summary judgment for defendants and remand for further proceedings.

## I.

Viewed in the light most favorable to plaintiff, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4 Cir.1985), the facts of this case are as follows. Plaintiff's son, Frank R. Jackson, had employed Pantazes as surety on a bond for the son's appearance in court to answer criminal charges. The son had used his parents' Silver Spring, Maryland address in papers filed with the court, although his parents claimed that theirs was not his residence, despite the fact that he occasionally slept there. Frank failed to appear in court on November 19, 1982 and bench warrants for his arrest were issued.

On the morning of December 23, 1983, plaintiff Betty Jackson answered a knock at her front door and found Pantazes and two county police officers. Pantazes asked if plaintiff's son Frank was there, and sought permission to enter the house. Mrs. Jackson, who was not yet dressed, told them that her son was not there; she denied them permission to enter and told them to wait until she dressed. Mrs. Jackson went to her bedroom and noticed Pantazes watching her through the bedroom window. She grabbed some clothing, dressed in the hall and then returned to the front door.

When she opened the door the second time, Pantazes and Goldberg were standing outside. Pantazes asked again if Frank was home. Mrs. Jackson again said no,

---

1. Plaintiff Betty Jackson is the mother of Frank R. Jackson, the fugitive. At the time of the events alleged in the complaint, his father was alive and living in the same household. Mr. Jackson, Sr. died before suit was filed and his estate was the other plaintiff. For some inexplicable reason, only Betty Jackson filed a notice of appeal from the judgment against both plaintiffs so that the claim of the estate is not before us.

When suit was brought, Montgomery County, Maryland was named as a third defendant. It was dismissed from the litigation by the district court and the correctness of that ruling is not contested in this appeal.

and volunteered that he was probably at his cousin's house in Hyattsville, Maryland. However, Pantazes insisted that Frank was within and made clear that he intended to enter the house. Despite her objections, Pantazes forced his way into the house by shoving the door into Mrs. Jackson, cutting her arm and causing her to fall backwards into the living room. Pantazes and Goldberg then dragged her out of the doorway and entered.

When Mrs. Jackson was able to get to her feet, she attempted to stop Pantazes, who kneed her in the thigh and walked further into the living room toward the kitchen. Goldberg, who had seen Mrs. Jackson's attempt to stop Pantazes and had witnessed the use of force against her, did nothing to stop Pantazes. Rather, Goldberg physically restrained Mrs. Jackson while Pantazes proceeded with his search.

Pantazes began kicking open and breaking unlocked doors inside the house. When Mrs. Jackson asked Officer Goldberg if this was allowed, Goldberg replied that Pantazes "can do whatever he wants." Goldberg continued to stand guard over Mrs. Jackson even when Pantazes kicked a bedroom door almost in half.

Mrs. Jackson, fearful of her own safety, told Pantazes and Goldberg that she intended to leave the house. Goldberg then commented to Pantazes that maybe they "shouldn't be in here and should give this more thought," and "[w]e may have gone too far here." Together, Pantazes and Goldberg left the house before Mrs. Jackson departed. Frank was not found on the premises.

Mrs. Jackson decided to go to the police department to swear out an arrest warrant for Pantazes. Just after she finished dressing, Mr. Jackson (her husband) returned home. She observed him in argument with the police outside their house and when he entered, she told him what had transpired. As she left the house, Pantazes, who had returned to the premises, approached her and threatened her and her husband with physical violence. Even

at a stop light en route to the police station, Pantazes, who had followed her, continued his threats. At a later time, Pantazes made similar threats to Mr. Jackson in telephone conversations.

At the police station, the Commissioner declined to issue a warrant against Pantazes on the ground that Pantazes "was acting in an official capacity in apprehending a fugitive at [the] time of [the] alleged assault." However, at the instance of Pantazes, the Commissioner issued a warrant for the arrest of Mrs. Jackson for assault and battery and for harboring a fugitive. This warrant was executed by Goldberg. At trial, Mrs. Jackson was found not guilty of all charges.

## II.

As we view it, this appeal presents two issues: first, was Pantazes a state actor so that he could be sued under § 1983, and, second, were there sufficient material facts in dispute to entitle plaintiffs to a trial on the issue of violation of their constitutional rights.

■ It is readily apparent that Goldberg was a state actor. He was a state officer, exercising his official powers, and the only issue with respect to him is whether plaintiff made a prima facie showing that he acted wrongfully and denied a federal right. We conclude that under the relevant Supreme Court precedents, Pantazes was also a state actor.

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), delineated the appropriate method for analyzing the issue of whether a party is a state actor so as to be subject to suit under § 1983:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state

official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

457 U.S. at 937, 102 S.Ct. at 2753.[2]

In seeking to apprehend Frank R. Jackson, a fugitive from justice, Pantazes, the bondsman, was exercising powers conferred on him by state law. Under Maryland law, Pantazes was "subrogated to the rights and means possessed by the State" to apprehend Frank and subject him to trial, and "to the extent necessary to accomplish this ... [to] restrain him of his liberty." *Frasher v. State*, 8 Md.App. 439, 260 A.2d 656, 660, *cert. denied*, 400 U.S. 959, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970). This authority includes the right to arrest the fugitive without legal process, and permits the bondsman to break and enter on private property to effect the arrest. *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1872).

We think that the second test articulated by *Lugar* was also met. Under the facts of this case, Pantazes obtained significant aid from Goldberg, the police officer, who was unquestionably exercising state authority. Goldberg not only assisted in gaining entrance to the Jackson home, he assisted in dragging Mrs. Jackson from the doorway, restrained her both physically and by oral advice while Pantazes conducted the search, and served the warrant on her for alleged assault and harboring a fugitive. This participation by a state official suffices to render Pantazes a state actor for purposes of § 1983. *Lugar*, 457 U.S. at 941–42, 102 S.Ct. at 2755–56; *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

◼ Indeed, in cases where a private party and a public official act jointly to produce the constitutional violation, both parts of the *Lugar* test are simultaneously satisfied:

> The two-part approach to a § 1983 cause of action was derived from *Adickes v. S.H. Kress & Co.*, 398 US 144, 150, 26 L Ed 2d 142, 90 S Ct 1598 [1604] (1970). Adickes was a § 1983 action brought against a private party, based on a claim of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Although stating that the § 1983 plaintiff must show both that he has been deprived "of a right secured by the 'Constitution and laws' of the United States" and that the defendant acted "under color of any statute ... of any State, ibid, we held that the private party's joint participation with a state official in a conspiracy to discriminate would constitute both "state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights" and action "under color of law for purposes of the statute." *Id.*, at 152 [90 S.Ct. at 1606]. ...

*Lugar*, 457 U.S. at 930–31, 102 S.Ct. at 2750.

This holds true, as in *Adickes*, even in the absence of any state statute, custom or policy which authorizes the private party's conduct; joint activity, alone, is sufficient. *Lugar*, 457 U.S. at 931, 932 n. 15, 102 S.Ct. at 2750, 2751 n. 15;[3] *Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 269 (private individuals can be liable under 18 U.S.C. § 242 for willful participation in plan to assault and murder three men released from police custody); *Scott v. Greenville County*, 716

---

**2.** *Lugar* concerned the liability of a private creditor who obtained a prejudgment attachment under a state statute alleged to be procedurally defective, and thus is factually different from the instant case. Nonetheless, it collected earlier authorities from which it derived the test for determining when the conduct of an actor is fairly attributable to the state so as to render his wrongful conduct the denial of a federal right, actionable under § 1983.

**3.** In *Lugar*, 457 U.S. 932 n. 15, 102 S.Ct. at 2751 n. 15, the Court made this explicit:

> It was with respect to this [conspiracy] count, which did not allege any unconstitutional statute or custom, that the Court [in *Adickes*] held that joint action of the private party and the police officer was sufficient to support a § 1983 suit against that party.... [T]he joint action count of Adickes did not involve a state law, whether "plainly unconstitutional" or not.

F.2d 1409, 1422 (4 Cir.1983) (private land-owners could be liable under § 1983 for conspiring with public officials to deny building permit for low-income housing project).

Similarly, both parts of the *Lugar* test are satisfied where the nature of the relationship between the state and private actors is one of interdependence, or 'symbiosis.' *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (restaurant's refusal to serve blacks held to constitute state action where restaurant leased space in public parking facility under arrangement with state that "confers on each a variety of mutual benefits").

In this case, the symbiotic relationship between bail bondsmen and the Maryland criminal court system suffices to render Pantazes' conduct state action. Bondsmen depend, for their livelihood, upon the judicial use of a bail bond system, and they are licensed by the state. In return, bondsmen facilitate the pretrial release of accused persons, monitor their whereabouts and retrieve them for trial. *See generally* Toborg, "Bail Bondsmen and Criminal Courts," 8 Just.Sys.J. 141, 142–43, 155–56 (1983); Note, "The Hunters and the Hunted: Rights and Liabilities of Bailbondsmen," 6 Fordham Urb.L.J. 333 (1978).

Since we hold that Pantazes was a state actor who could be sued under § 1983, we turn to the sufficiency of plaintiff's proof to withstand the motions for summary judgment.

### III.

■ Because the district court concluded that Pantazes was not a state actor, it had no occasion to consider whether plaintiff had established a sufficient case against him to survive his motion for summary judgment. We conclude that she did. While Pantazes undoubtedly had the right to enter the Jackson home, including the right to break in to effect entry, plaintiff has offered evidence from which a fact finder could conclude that Pantazes used excessive force and unnecessarily de-stroyed property, in violation of plaintiff's constitutional rights. There is evidence that Pantazes shoved the front door into Mrs. Jackson's arm, cutting it and causing it to bleed, that he dragged her out of the entry, that he kneed her in the thigh, that he broke unlocked doors, that he threatened further violence to her and her family, and that he procured her false arrest. Although these allegations are disputed, the evidence, if believed by the fact finder, suffices to establish violations of constitutional rights.

■ The sufficiency of the evidence to establish a jury question against Goldberg for denying plaintiff's constitutional rights is a closer question. As to the use of excessive force, Goldberg did no more than help drag Mrs. Jackson out of the doorway, and this is probably not enough to permit her any monetary recovery. But there is also evidence that Goldberg physically restrained her while Pantazes engaged in a violent and excessive search, and that Goldberg advised her that Pantazes had authority to assault her and unnecessarily destroy her property. We think that the fact finder could reasonably conclude that Goldberg engaged in concerted activity with Pantazes to deprive plaintiff of her constitutional rights. Moreover, from the evidence, if believed, that Goldberg failed to protect Mrs. Jackson and her property from illegal excesses perpetrated by Pantazes when, as a police officer, Goldberg had a duty to act, liability on his part may be found. *Monroe v. Pape*, 365 U.S. 167, 175–76, 180, 81 S.Ct. 473, 477–78, 480, 5 L.Ed.2d 492 (1961); *Byrd v. Brishke*, 466 F.2d 6 (7 Cir.1972); *Azar v. Conley*, 456 F.2d 1382 (6 Cir.1972); *Downie v. Powers*, 193 F.2d 760 (10 Cir.1951).

The judgment of the district court must be reversed and the case remanded for trial.

REVERSED AND REMANDED.