**Bennett A. MASEL, Plaintiff,**

v.

**Michael BARRETT, Defendant.**

**Civ. A. No. 87–2505–LFO.**

United States District Court, District of Columbia.

Feb. 23, 1989.

Lee H. Karlin, Washington, D.C., for plaintiff.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

The complaint in this action, filed on September 11, 1987, named as defendants United States Park Police Officers Michael Barrett and Donald Jelinek. On December 7, 1987, both defendants filed a motion to dismiss or for summary judgment. By Order of April 8, 1988, that motion was granted in part and denied in part. An Order filed on May 13, 1988, granted defendant Jelinek's motion for reconsideration and dismissed him from the case without prejudice. At a hearing on June 24, 1988, the Court denied plaintiff's motion for leave to file an Amended Complaint. Due to inadvertence, no Order was issued on that ruling; therefore, the accompanying Order will deny plaintiff's motion for leave to file an Amended Complaint. On December 2, 1988, the remaining defendant, Michael Barrett, filed a motion to dismiss or for summary judgment on the only remaining claim in this case, use of excessive force in violation of the Fourth Amendment of the United States Constitution. Plaintiff has opposed the motion, defendant has replied, and a hearing was held on January 30, 1989. Because some genuine issues of material fact remain in dispute and because defendant has not established that he is entitled to qualified immunity on the basis of those facts not in dispute, defendant's motion for summary judgment must be denied as to plaintiff's claims against defendant in his individual capacity. Because plaintiff has not properly filed an administrative claim pursuant to the Federal Tort Claims Act, however, defendant's motion to dismiss must be granted as to plaintiff's claims against defendant in his offical capacity.

### I.

For the purpose of assessing defendant's motion for summary judgment, only undisputed facts or contested facts seen in the light most favorable to plaintiff may be considered. From that perspective, the events at issue in this suit are as follows. At approximately 3:30 p.m. on June 7, 1987, plaintiff and a group of approximately 30 persons were participating in a demonstration on the sidewalk directly in front of the White House. The demonstrators were carrying banners, signs, and placards urging the impeachment of then President Ronald Reagan, then Vice–President George Bush, and then Attorney General Edwin Meese and the termination of research in support of a space-based anti-ballistic missile system. *See* Affidavit of Bennett A. Masel (Jan. 24, 1988) ("Masel Affidavit") at ¶¶ 1, 2. Defendant was assigned to supervise the approximately half a dozen United States Park Police officers who were assigned to monitor the demonstration. *See* Declaration of Michael Barrett (Nov. 24, 1987) ("Barrett Declaration") at ¶ 2.

Defendant observed two demonstrators carrying a banner that violated the White House sidewalk sign size regulations, 36 C.F.R. § 7.96(g)(5)(viii). *See id.* at ¶ 4. After defendant warned the two demonstrators that they would face arrest if they did not remove the banner, plaintiff approached the demonstrators and volunteered to carry the banner instead. *See id.* at ¶¶ 4, 5; Masel Affidavit at ¶ 6. As plaintiff walked in a "loop," he received two warnings from Park Police officers at five minute intervals that, if he did not cease to display the banner, he would be arrested. *See* Masel Affidavit at ¶ 7. *But see* Barrett Declaration at ¶¶ 6, 7 (stating that defendant warned plaintiff on three occasions). Several minutes later, one of the demonstrators, Mary Huddle, shouted to the participants "that the demonstration was over[,] and at that time the participants in the demonstration began to disperse." Affidavit of Mary Huddle (Jan. 20, 1988) ("Huddle Affidavit") at ¶ 8. Upon hearing Huddle's shout, plaintiff folded the banner he was carrying and walked east toward the persons with whom he planned to depart. *See* Masel Affidavit at ¶ 10.

Plaintiff was then approached by Officer Jelinek, who had been ordered by defendant to arrest plaintiff and who grabbed plaintiff's upper right arm. *See id.* at ¶ 11; Barrett Declaration at ¶ 7; Declaration of Donald Jelinek (Nov. 30, 1987) at ¶ 6. Plaintiff then received a sharp blow to the back of his head. When he spun around to determine the source of the blow, another unidentified Park Police officer grabbed his left arm. *See* Masel Affidavit at ¶ 12. One or two Park Police officers then grabbed plaintiff's legs, and, as plaintiff offered no resistance, the officers dragged him head first over a concrete barrier that separates the White House sidewalk from Pennsylvania Avenue. *See id.* at ¶ 13; Supplemental Affidavit of Bennett A. Masel (Dec. 20, 1988); Dellinger Affidavit at ¶¶ 6–9; Huddle Affidavit at ¶¶ 11–13. Defendant, acting in the capacity of Officer Jelinek's onsite supervisor, "observed the entire sequence of Masel's arrest by Officer Jelinek," but did not come to plaintiff's assistance as he was dragged to and then over

the concrete barrier. Barrett Declaration at ¶ 19.

According to plaintiff's version of the facts, which must be accepted as true for purposes of ruling on defendant's motion for summary judgment, as plaintiff was lying, subdued and face down, on Pennsylvania Avenue, surrounded by Park Police officers and under their control, defendant approached plaintiff and struck him three or four times in the lower back with a long wooden nightstick. *See* Dellinger Affidavit at ¶¶ 12–16, 18–19; Huddle Affidavit at ¶¶ 15–16. *But see* Barrett Declaration at ¶ 14 ("I did not at any time strike Masel with a nightstick or otherwise."). At the time he was struck, plaintiff was offering no resistance to the officers and was "helpless." *See* Dellinger Affidavit at ¶ 17; Masel Affidavit at ¶ 15. As a result of being dragged over the concrete barrier and hit with a nightstick, plaintiff suffered injuries that required treatment at the George Washington University Hospital emergency room and limited his mobility for two and a half weeks. *See* Masel Affidavit at ¶¶ 17–18.

## II.

Plaintiff sues defendant in both his official and individual capacities. Sovereign immunity, however, bars all actions for damages against government officers in their official capacities, unless the United States has expressly waived immunity. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Although the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, constitutes such a waiver, the Act precludes all actions for money damages against federal officers acting in their official capacities unless "the claimant shall have first presented the claim to the appropriate Federal agency." *Id.* at § 2675(a). Defendant has asserted that plaintiff has made no such claim to the United States Park Police, and plaintiff has not disputed this assertion. *See* Defendant's Memorandum in Reply to Plaintiff's Opposition to the Motion to Dismiss or for Summary Judgment ("Defendant's Reply") at 1. Accordingly,

the accompanying Order will grant defendant's motion to dismiss plaintiff's claims against defendant in his official capacity.

## III.

Plaintiff alleges two possible theories of liability against defendant acting in his individual capacity.[1] First, plaintiff claims that defendant is liable for failing to intervene when he observed Officer Jelinek and others violating the Fourth Amendment's prohibition against the use of excessive force when they dragged plaintiff over the concrete barrier. Second, plaintiff claims that defendant is directly liable for hitting plaintiff three or four times with his nightstick.

## A.

■ To be found liable for the injuries plaintiff received when he was dragged over the concrete barrier, defendant must be found (1) to have had a duty arising under the Constitution, (2) to have violated that duty, and (3) to have acted in a manner that fails to meet the standard for qualified official immunity. The first issue—the scope of defendant's constitutional duty to protect plaintiff from harm in the context of an observed arrest—has not been addressed by the Court of Appeals for this Circuit. The Court of Appeals has held that "a law enforcement officer is answerable in damages for standing by and failing to protect a member of the public from an assault allegedly perpetrated by a fellow officer," but it did so in the context of a common law, rather than a constitutional, tort. *See Martin v. Malhoyt,* 830 F.2d 237, 259 (D.C.Cir.1987). There is a difference between recognizing a common law "duty to protect" that arises when a police officer and an individual citizen are in a special relationship [2] and recognizing a duty *arising from the Constitution* to intervene to prevent the violation of constitutional rights such as the right against the use of excessive force. Thus, although the holding in *Martin* indicates that the Court of Appeals for this Circuit finds affirmative duties on the police not inappropriate, it is not directly on point as regards the existence of a constitutionally based duty.[3]

1. Because defendant is a federal rather than a state officer, plaintiff proceeds under the doctrine announced in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), rather than under 42 U.S.C. § 1983. Although many of the cases that establish the scope of an official's duty and of an official's immunity in the context of constitutional torts arose under § 1983, there is no reason why the scope of a state official's duty or immunity should differ from a federal official's in the context of rights guaranteed by the United States Constitution. *See Haynesworth v. Miller,* 820 F.2d 1245, 1248 n. 1 (D.C.Cir.1987) (relying on caselaw developed in the § 1983 context in a *Bivens* action because "optimally the remedies should be congruent in both the specifics of their operation and the relief they afford"). Accordingly, § 1983 cases relied on herein will be treated, unless otherwise indicated, as if decided under the *Bivens* doctrine for purposes of establishing the scope of defendant's constitutional duties and immunities.

2. In the common law context, the Court of Appeals has held that a "special relationship" exists when "the police have 'beg[un] to act in behalf of a particular citizen in such a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community.'" *Martin v. Malhoyt,* 830 F.2d 237, 259 (D.C.Cir.1987) (quoting *Morgan v. District of Columbia,* 468 A.2d 1306, 1312 (D.C.1983) (*en banc*)). For the same reasons that not every police officer has a duty to protect every individual from common law assault and battery, only police officers in a "special relationship" with an individual should be found to have a duty to prevent the violation of that individual's constitutional rights. To hold otherwise would place enormous affirmative duties on the police inconsistent with both the practical demands of law enforcement and the general thrust of the Constitution itself, which favors negative restrictions on governmental power. *See, e.g.,* Wells & Eaton, *Affirmative Duty and Constitutional Tort,* 16 U.Mich.J.L.Ref. 1, 1 (1982). It is only when an officer has placed himself in a "special relationship" that the negative proscriptions of the Fourth Amendment can be found to have created an affirmative duty. By ordering Officer Jelinek to arrest plaintiff and observing the events surrounding that arrest, however, defendant clearly placed himself in a special relationship with plaintiff.

3. This case is made more difficult than it might otherwise be by plaintiff's failure to plead common law assault and battery. Had he done so, the *Martin* holding would be directly applicable. However, plaintiff has chosen to proceed exclusively on a constitutional tort theory.

Other circuits, however, have directly addressed the issue of affirmative duties arising under the Constitution in similar cases of police-observed beatings. Although they have extracted different standards of conduct, all of the circuits that have spoken to the issue have held that a police officer may have a duty, in certain circumstances, to prevent another officer from violating an individual's constitutional rights. The leading case establishing that police officers, whether in a supervisory capacity or not, have a constitutionally based duty to intervene in certain circumstances when other officers are violating an individual's constitutional rights is *Byrd v. Brishke*, 466 F.2d 6 (7th Cir.1972). In *Byrd*, plaintiff alleged that he was taken into a back room in the Little Egypt Tavern, surrounded by approximately a dozen Chicago police officers, and struck repeatedly. Because he could not identify which of the officers struck the blows, plaintiff's principal theory of liability under 42 U.S.C. § 1983 was that "even if [the officers] did not personally participate in the violation of plaintiff's civil rights by beating him, they are liable in law for negligently or intentionally failing to protect the plaintiff from others who did violate his rights by beating him in their presence." *Id.* at 10. Applying the principles of tort law to the developing area of constitutional torts, the Seventh Circuit held that an officer can be held liable for money damages for a constitutional tort based on misfeasance or nonfeasance. *See id.* Although true for all officers, the existence of an affirmative duty is especially strong for those officers, such as defendant, who are given on-site supervisory authority over other officers who then violate individuals' constitutional rights. Specifically, the court stated in defining a peer officer's duty:

We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. *That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed.* So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment....

*Id.* at 11 (emphasis added). Although the court never expressly stated that the origin of this affirmative duty was found in the Constitution, the action was filed under § 1983, not as a common law tort, and, hence, by implication, the duty is one arising from the Constitution rather than from the common law.

Other circuits that have addressed the issue have uniformly found a constitutional duty for a police officer, particularly one in a supervisory capacity, to intervene affirmatively to prevent the violation of constitutional rights by another officer.[4] A merely negligent failure to intervene, however, cannot produce liability. *See Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Haynesworth v. Miller*, 820 F.2d 1245, 1261 (D.C.Cir.1987). Rather, the officer who fails to act must do so with knowledge of or deliberate indifference to the action that violates constitutional rights. *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) (knowledge); *Putman v. Gerloff*, 639 F.2d 415, 423–24 (8th Cir.1981) (knowledge); *Byrd v. Brishke, supra*, 466 F.2d at 11 (knowledge); *Doe v. New York*

---

4. *See, e.g., Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir.1983); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."); *Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir. 1987); *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir.1976); *Bruner v. Dunaway*, 684 F.2d 422, 425–26 (6th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983);

*Putman v. Gerloff*, 639 F.2d 415, 423–24 (8th Cir.1981); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir.1984), *vacated on other grounds*, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed. 2d 33 (1985); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.").

*City Dept. of Social Serv.,* 649 F.2d 134, 141 (2d Cir.1981) (deliberate indifference); *cf. Haynesworth v. Miller, supra,* 820 F.2d at 1263 (knowledge or indifference).

■ Genuine issues of material fact remain as to whether defendant failed ·to intervene with knowledge or deliberate indifference as to the use of excessive force by subordinate officers. Thus, summary judgment on this issue would be inappropriate. Based on plaintiff's version of the facts, defendant ordered Officer Jelinek to arrest plaintiff and then stood by and observed as three or four officers dragged the non-resisting plaintiff over a concrete barrier. This is sufficient, at least for purposes of a motion for summary judgment, to establish (1) a use of excessive force by the other officers, (2) defendant's supervisory role and knowledge of the use of force, and (3) defendant's failure to act in spite of a duty to do so. Of course, to prevail at trial, plaintiff will have to persuade a jury of all of this as well as establishing that defendant could have prevented some of plaintiff's injuries, *i.e.,* that defendant's unconstitutional failure to intervene was a proximate cause of plaintiff's injuries. *See Haynesworth v. Miller, supra,* 820 F.2d at 1262; *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir.1984); *Putman v. Gerloff, supra,* 639 F.2d 415, 424 (8th Cir.1981). At this point, however, a genuine issue of material fact remains as to proximate cause.

■ Defendant's remaining defense, therefore, is based on immunity. In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court held that the qualified immunity doctrine of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), should be applied to federal law enforcement officers. *See The Supreme Court, 1986 Term—Leading Cases,* 101 Harv.L.Rev. 119, 227–28 (1987). Under *Harlow,* whether an official protected by qualified immunity may be held personally liable depends on the "objective legal reasonableness" of the allegedly unlawful action, assessed in light of the legal rules that were "clearly established" at the time

the action was taken. *See Anderson, supra,* 107 S.Ct. at 3038 (quoting *Harlow, supra,* 457 U.S. at 819, 818, 102 S.Ct. at 2738). The "clearly established" rule, however, cannot be so broadly defined that plaintiffs would be able to convert the rule of qualified immunity into "a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* 107 S.Ct. at 3039. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

In this case, a reasonable officer in defendant's position would have known that he had a duty to intervene to protect plaintiff. Although defendant argues that "there was no clearly established law in this circuit that he had a duty to intervene" because *Martin v. Malhoyt* was decided after the incident in dispute, *see* Defendant's Reply at 6, plaintiff need not demonstrate that "the very action in question has previously been held unlawful." *Anderson, supra,* 107 S.Ct. at 3039 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985)). Given the District of Columbia cases cited by the *Martin* court, a reasonable officer certainly should have known that he had at the very least a common law duty to intervene to protect plaintiff from an assault allegedly perpetrated by a subordinate officer in defendant's presence. *See Martin, supra,* 830 F.2d at 259. Furthermore, given the holdings of other federal courts at the time of the incident, *see, e.g., supra* at 8 n. 4, and the assumptions required at this summary judgment stage of the proceeding, the unlawfulness of defendant's standing by as officers under his control and supervision dragged a non-resisting, non-threatening plaintiff over a concrete barrier must have been "apparent." *Anderson, supra,* 107 S.Ct. at 3039. Because, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to plaintiff, a reasonable jury could conclude that the unlawfulness of defendant's inaction was so apparent that "no reasonable officer could have believed in the lawfulness of his actions," the motion for summary judg-

ment must be denied as to liability for failing to intervene when Officer Jelinek and others dragged plaintiff over the concrete barrier. *Martin, supra,* 830 F.2d at 253–54.[5]

### B.

The issues with regard to defendant's alleged beating of plaintiff with a nightstick, because they involve direct contact between plaintiff and defendant, are more straightforward. Defendant's primary contention is that his actions in beating plaintiff with a nightstick do not violate the "objective standard of reasonableness" necessary to find a violation of the Fourth Amendment. *See id.* at 261. Reasonableness is to be determined "by balancing the infringement of the individual's interest caused by the police action against the governmental interest served by that action." *Id.* Viewing the disputed facts from plaintiff's perspective, defendant's actions were unreasonable.

Looking first to the extent of the infringement of plaintiff's interests, the clubbing cannot be deemed insignificant. The injuries sustained were serious enough to warrant a visit to a nearby emergency room and to limit plaintiff's mobility for over two weeks. Furthermore, although defendant argues that "the fact that the plaintiff was demonstrating at the time of his arrest is completely irrelevant to a Fourth Amendment excessive force or qualified immunity determination," Defendant's Reply at 5 n. 4, plaintiff's exercise of his constitutionally protected right to freedom of speech at the time of his arrest is certainly part of the totality of the circumstances that must be considered. In considering the interests that were infringed, one cannot ignore the possible harm to First Amendment values occasioned by defendant's conduct. Viewing the facts in the light most favorable to plaintiff, a reasonable jury could find that the clubbing

was done in retaliation for plaintiff's expression of constitutionally protected political speech. Such disregard for First Amendment values would certainly be relevant to an assessment of the "reasonableness" of defendant's conduct. Thus, it is not necessary to allege and prove violation of First Amendment rights in order to establish that police clubbing of a peaceful, non-resisting demonstrator in custody is, without more, unreasonable within the meaning of the Fourth Amendment.

Police officers should take into account the possible impact their actions will have on the free and open exercise of fundamental rights. If they do not, conduct that might be deemed reasonable in other circumstances could wind up deterring those who are arrested—and those who observe the arrest either in person or through media reports—from participating in constitutionally protected activities. In this case, the interest that has been infringed is not only plaintiff's interest in bodily security, but also plaintiff's, and the nation's, interest in free expression.

Weighing against those interests is "the governmental interest served by [defendant's] action." *Martin, supra,* 830 F.2d at 261. Although the government has an interest in arresting those who violate National Park Service regulations, the more particularized question is whether the government has a significant interest in arresting demonstrators in the manner in which plaintiff was arrested. At the summary judgment stage of this case it must be assumed that defendant observed plaintiff being dragged over a concrete barrier and then held, face down, on Pennsylvania Avenue by three or four Park Police officers. Defendant then approached plaintiff and clubbed him three or four times with a wooden nightstick. Although one could recognize a governmental interest being served by subduing, even with force, a hostile, agitated detainee, the governmen-

---

5. As noted in the Order of April 8, 1988, the "reasonableness" prong of the *Harlow* immunity inquiry merges into an analysis of the merits of plaintiff's excessive force claim. *See* Order of April 8, 1988 at 8. As has already been stated, when one takes plaintiff's version of the facts in dispute, the actions of Officer Jelinek and the other officers who dragged the passive, non-threatening plaintiff (who was attempting to leave the demonstration site peacefully) over the concrete barrier were unreasonable and in violation of the Fourth Amendment.

tal interest being served by clubbing a restrained, passive detainee such as plaintiff is not apparent on this record. Given the significant infringement of plaintiff's interests and the paucity of governmental interests, if any, in this beating, defendant's conduct, if proved, would not meet the "objective standard of reasonableness" mandated by the Fourth Amendment.

This conclusion is buttressed by looking to the four factors defendant suggests are essential to determining "whether the constitutional line has been crossed," namely:

> the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). As discussed above, at the time of the beating the record does not now show any need to use force to restrain or subdue an already restrained and subdued arrestee under the close control of three or four Park Police officers. As a result, any use of force—but especially a third or a fourth blow with a nightstick—was disproportionate to the need for such use. In addition, although the injuries sustained were not as dramatic as those found in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), they were nonetheless quite serious. As to whether defendant's actions were taken in good faith or maliciously, there is simply no way to determine that issue at this juncture. Plaintiff has established, however, for purposes of a motion for summary judgment, that a reasonable jury could find, on the basis of plaintiff's version of the facts, that defendant acted, in whole or in part, "for the very purpose of causing harm." Thus, even the test proposed by defendant yields the conclusion that he did not meet the "objective standard of reasonableness" when he allegedly struck plaintiff three or four times with a nightstick.

Defendant's contention that he is entitled to qualified immunity because there was no "clearly established" rule of law to govern his conduct at that time also fails. Defendant's primary contention is "that there is no 'clearly established' law as to when and where the line is crossed from constitutionally reasonable force to constitutionally excessive force." Defendant's Memorandum in Support of Defendant's Motion to Dismiss or for Summary Judgment at 20. This misinterprets Supreme Court precedent. The Court has never held that an official is entitled to immunity whenever he acts in an area in which there is no "bright line" between constitutional and unconstitutional behavior. To so hold would immunize every police officer who conducts a search, no matter how unreasonable, or uses force, no matter how excessive, simply because the law of the Fourth Amendment, at the margins, is not crystal clear.

Rather, the Court has stated that a rule of law is "clearly established" when "a reasonable official would understand that what he is doing violates that right." *Anderson, supra*, 107 S.Ct. at 3039. Thus, if an officer conducts a search of a house that a reasonable officer would understand as violating the Fourth Amendment, that officer can be liable even though nobody, whether a lawyer, professor, judge, or police officer, could identify the precise point at which that search would have become reasonable. So too in this case, even though the line between reasonable force and excessive force is indeed murky, it is nevertheless possible to hold defendant liable for conduct that clearly falls on the unconstitutional side of that murky line. For reasons that have already been discussed at length, defendant's conduct, for purposes of a motion for summary judgment, was sufficiently egregious that a reasonable officer would have understood that the conduct violated the Fourth Amendment. No reasonable officer could have believed that beating a defenseless, restrained demonstrator with a nightstick was constitutionally permissible. Accordingly, the accompanying Order will deny defendant's motion for summary judgment

as to defendant's direct encounter with plaintiff.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 22nd day of February, 1989, hereby

ORDERED: that plaintiff's motion for leave to file an Amended Complaint should be, and is hereby, DENIED; and it is further

ORDERED: that defendant's motion to dismiss the claims against defendant in his official capacity should be, and is hereby, GRANTED; and it is further

ORDERED: that defendant's motion to dismiss or for summary judgment, treated as a motion for summary judgment as to the claims against defendant in his individual capacity, should be, and is hereby, DENIED.