For the reasons set forth in the Court's Memorandum Opinion of even date, it is hereby

**ORDERED** that the parties' motions for summary judgment (docket item numbers 70 and 72) are **DENIED** in all respects.

**Sandra ALLEN, et al.**

*v.*

**COLUMBIA MALL INC., et al.**

**No. CIV. L–96–1546.**

United States District Court, D. Maryland.

March 18, 1999.

David L. Douglas, Theresa H. Hajost, Washington, DC, Richard H. Gordin, Tighe, Patton, Tabackman, Babbin, Washington, DC, for plaintiffs.

Jay Morstein, Eric Paltell, Theresa M. Connolly, Baltimore, MD, for defendants Columbia Mall, Inc.

Robert Jackson, Richard Ortiz, Michael McCollum, Andrea Jette, Pamela Berman, Leigh Earl Slayne, Boston, MA, Robert H. Bouse, Jr., H. Joy Sharp, Baltimore, MD, for defendant Malls Learningsmith, Inc., Evelyn Eichorn and Jeremiah Gallay.

1. The defendant security guards are Robert Jackson, Michael McCollum, Andrea Jette, and Richard Ortiz.

2. The defendant employees are Evelyn Eichhorn and Jeremiah Gallay.

3. These torts include: i) false imprisonment (as against all defendants); ii) defamation (as against all defendants); iii) assault (as against all defendants); iv) negligent training and supervision (as against Columbia Mall and Lear-

*MEMORANDUM*

LEGG, District Judge.

While the Allen family was Christmas shopping at the Columbia Mall in December 1995, Christian Allen and his friend, Chelton Thorpe, were accused of shoplifting at a Learningsmith store. These two young men and Christian Allen's mother, Sandra Allen ("Allen"), filed the present case against Columbia Mall and four of its security guards[1] (collectively "Mall defendants") and Learningsmith, Inc. and two of its employees[2] (collectively "Learningsmith defendants"). All African–Americans, the plaintiffs allege racial discrimination and unlawful search and seizure as against all defendants, and various Maryland state torts.[3]

Jurisdiction is premised on a federal question—namely Count I, which charges the defendants with racial discrimination and unlawful search and seizure in violation of 42 U.S.C. § 1983. The state tort claims are before this Court through supplemental jurisdiction, 28 U.S.C. § 1367.[4]

Currently pending is the Mall defendants' Motion for Summary Judgment. For the following reasons the Court agrees with the Mall defendants that there is no state action to support the plaintiffs' § 1983 claim and GRANTS the Motion for Summary Judgment as to Count I of the Second Amended Complaint as against all defendants. Because the plaintiffs' § 1983 claim fails, this Court no longer has original subject matter jurisdiction over the case. Accordingly, the Court will DIS-

ningsmith); and v) negligence (as against all defendants).

4. If a federal district court has original jurisdiction over a claim, this statute allows that court to assume jurisdiction over all other claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

MISS the state tort claims as against all defendants.

## I. Background

On December 21, 1995, Allen was Christmas shopping at Columbia Mall along with her mother, her three children (including Christian Allen, age fourteen), and Christian Allen's friend, Thorpe, also age fourteen. (*See* 2nd Am. Compl. at ¶ 14). All members of Allen's family and Thorpe are African–American. (*See id.*). While Allen and her mother were elsewhere in the Mall, the four children entered the Learningsmith store. (*See* Christian Allen Dep. at 38). As the children browsed, at least one customer informed the Learningsmith employees (defendants Eichhorn and Gallay), that she had seen the two teenage boys shoplifting. (*See* Eichhorn Dep. at 63; Allen Dep. at 46–47).

A Learningsmith employee apparently called Columbia Mall security for assistance. Kevin Klevins, lead security officer, took the call and dispatched defendant Jackson to the store via radio. (*See* Klevins Dep. at 145). Security officers Ortiz and Jette, who were near Learningsmith, also responded to the radio call. (*See* Ortiz Dep. at 75; Jette Dep. at 85). At some point, defendant McCollum also came to the store. (*See* Jackson Dep. at 146). Jackson arrived first, and Eichhorn apprised him of the situation. (*See* Eichhorn Dep. at 102–103). Jackson told Eichhorn that in order to be guilty of shoplifting, the young men must have left the store with stolen merchandise. (*See id.*).

Shortly thereafter, Allen called her children to go home. (*See* Christian Allen Dep. at 33). Christian Allen's brother and sister exited the store, but when Christian Allen and Thorpe attempted to leave, they were stopped by the defendant security guards and by the Learningsmith employees. (*See id.* at p. 38). Eichhorn told the teenagers that two customers had accused them of shoplifting and asked them to empty their pockets.[5] (*See id.* at pp. 38–40). Although no one touched the young men, they complied, emptying their pants and jacket pockets in full view of Mall patrons. (*See id.* at 44–45). Nothing was found. (*See* 2nd Am. Compl. at ¶ 21).

Allen told the young men to wait for her at the food court. (*See* Allen Dep. at 106). She entered Learningsmith and complained "that the incident embarrassed her and her family." (2nd Am. Compl. at ¶ 22). Allen left to retrieve her children but was followed by Gallay and a security guard. (*See* Allen Dep. at 108). Gallay conducted a second search of the young men's jackets at the food court, again finding nothing. (*See id.* at 108–109).

At this point, Allen asked to speak with Gallay's supervisor. (*See id.* at 109). She complained to the supervisor that the search was racially motivated. (*See id.* at 62). Gallay proposed searching Allen's bags, but she refused, explaining that she had not been in the store with her bags. (*See id.*).

Allen next asked where to file a complaint. (*See id.* at 109). She alleges that Ortiz told her that she could not leave until she was released. (*See id.* at 114). Allen states she waited at a table in the food

5. In her deposition, Allen states that both Eichhorn and the security guards asked the teenagers to empty their pockets. This testimony, however, is inconsistent with the depositions of Christian Allen (at 38–40), Thorpe (at 33–34), Eichhorn at (64–65), and Jackson (at 128–129). All witnesses other than Allen state that only Eichhorn (not the security guards) asked the young men to empty their pockets.

The Court finds that a reasonable juror would conclude that only Eichhorn asked the young men to empty their pockets. Even if Allen's contrary recollection created a dispute of fact, that dispute would not alter the outcome of the Summary Judgment Motion. As discussed below, Klevins' involvement in the Learningsmith incident did not rise to the level of joint action necessary to support the plaintiffs' allegation that the defendants acted under color of state law

court until told that she was released. (*See id.* at 117). Then, Allen filed a complaint with the Mall and returned home with her family. (*See id.* at 118–120). The plaintiffs filed the present lawsuit in May 1996.

## II. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material factual disputes are "genuine" if a reasonable jury could return a verdict for the nonmoving party based upon the record as a whole. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. 2505.

Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir. 1987). Accordingly, the Court will draw all reasonable inferences in favor of the plaintiffs for purposes of the Mall defendants' Motion.

## III. Discussion

### A. Count I: § 1983

In Count I, the plaintiffs sue all defendants under 42 U.S.C. § 1983 for race discrimination in violation of the Thirteenth and Fourteenth Amendments and for unlawful search and seizure in violation of the Fourth Amendment.[6] "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The Mall defendants contend that even if constitutional violations did occur, they were not committed by someone acting under color of state law. The Court agrees.

█ It is not necessary for an individual to be a state officer to act under color of state law for purposes of § 1983 actions. If a private person is "jointly engaged" with a state official in the alleged violation, that person acts under color of state law. *See e.g. Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

█ Accordingly, the Court must consider the individuals involved in the incident to determine if any were state officials or otherwise acting under color of state law. The Learningsmith defendants were clearly not state officials. They detained the two young men pursuant to the Maryland shopholder's privilege. *See* Md. Code Ann., Jud. Proc., § 5–402.[7] Although the Learningsmith defendants acted pursuant to a state statute, this is not enough to make them state actors for purposes of § 1983. They must have also "acted together with" or "obtained signifi-

---

6. Although the plaintiffs allege racial discrimination, Thorpe stated in deposition that he does not think race had anything to do with the incident. (*See* Thorpe Dep. at 69). Both Allen and her son admit that they have no facts to support their allegations of racial discrimination. (*See* Allen Dep. at 138; Christian Allen Dep. at 94).

7. This statute affords immunity in civil suits for detention, slander, malicious prosecution, and false arrest to merchants (and their agents) who detain suspected shoplifters with probable cause.

cant aid from state officials...." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). As explained below, the Learningsmith employees were not jointly engaged with state officials so as to transform their conduct into state action.

■ It is undisputed that the defendant security guards were employees of a private company with no police powers and, therefore, were not state officers. In fact, the only security guard with police powers at the Mall during the incident was Klevins, the lead security officer, who dispatched Jackson to Learningsmith. Klevins was a "specially commissioned officer" under Maryland law.[8] The plaintiffs argue that the security guards acted jointly with Klevins, thereby bringing the guards' actions under color of state law. Accordingly, the Court must decide whether a reasonable juror could conclude that the guards and Klevins were jointly engaged in the alleged constitutional violations.

### 1. The Columbia Mall's "Security Plan"

According to Mall policy, the security guards operated pursuant to a written, "Security Plan." (*See* Ds' Mot. for Sum. J., Exh. 1). Guards, who are employees of the Mall, wear police-like uniforms and carry portable radios and handcuffs. They do not carry guns or other weapons.[9]

For purposes of the Security Plan, the Mall is essentially divided into the common areas and the stores. Security guards have jurisdiction in the common areas of the Mall. Within these common areas, the security guards perform such tasks as answering the questions of Mall patrons, asking vagrants and loiterers to "keep moving," and locking and unlocking mall doors. Security guards do not chase people suspected of offenses or crimes unless they believe that "immediate intervention can prevent serious bodily injury to another without undue risk of injury to the officer or others." (*Id.* at 27). Because security guards have only "citizen arrest" powers, they generally "defer to local police for purposes of apprehension or arrest." (*Id.*)

In contrast, the security guards have no jurisdiction within the stores of the Mall. The stores are leased spaces which are owned and controlled by the tenant merchants. Guards are not responsible for security within these tenant areas. (*See id.* at 26). Because shoplifting necessarily occurs within stores, security guards have very little power or responsibility with respect to suspected shoplifters. Essentially, security guards can conduct a "walk-through" of a store to deter suspected shoplifters from leaving the store with stolen merchandise. Security guards cannot, however, detain or search suspected shoplifters. This is the responsibility of merchants. If a merchant decides to detain a suspect, security guards have the limited role of offering their "presence" to prevent a breach of peace. The purpose of this presence is to secure the physical safety of merchants and patrons, not to protect or recover property. It is the merchant's responsibility to call the police if desired; security guards will call the police only upon request. (*See* DeCarlo Report, at 5).

---

8. As a specially commissioned officer, Klevins had the authority to write parking tickets at the mall and to arrest people suspected of committing crimes within the mall common areas and parking lot. The mere fact that Klevins received his police powers pursuant to a Maryland statute does not mean that defendant security guards—his subordinates—acted under color of state law.

9. The policy states, "[a]ll weapons are prohibited including firearms, mace, nightsticks, or similar devices. Presently, the only exceptions are that nightsticks may be issued to security personnel trained in their use, as approved within the center's security plan, if specifically approved by The Rouse Company Security Committee and oleoresin capsicum (OC) spray may be used by Security Supervisors trained in accordance with The Rouse Company Guidelines." (Ds' Mot. for Sum. J., Exh. 1, at 23).

### 1. Klevins' Involvement

On the night of December 21, 1995, Klevins was in charge of the Mall's security officers. To the best of his recollection, he received a very general call from Learningsmith, requesting assistance. He does not recall that the word, "shoplifting" was used. He does not recall being told that the incident involved two young men. He stated in deposition that the race of the suspects was never mentioned. In fact, Klevins stated that he did not discover that the suspects were African–American until the plaintiffs filed the present case. (*See* Klevins Dep. at 152–153). To the best of his recollection, the caller simply stated, "Security, come to Learningsmith." (*Id.* at 147). The plaintiffs offer no evidence to the contrary.

Responding to the call, Klevins dispatched security officer Jackson to Learningsmith over the radio because his post was closest to the store. Jackson reported to Learningsmith. At the time that the call came over the radio, security officer Ortiz was conducting a light check in the Mall, accompanied by security officer Jette, who was off-duty. Because they were near the store at the time, Ortiz and Jette also came to Learningsmith. Having heard the radio communication, security officer McCollum also approached the store. Upon seeing that the situation was under control, McCollum left. Ortiz, Jette, and McCollum came to Learningsmith by their own volition; Klevins did not instruct any of these defendants to report to the store.

The facts are clear that Klevins was never at the scene during the incident at issue. His only "presence" was via radio contact with the subordinate security guards. Off-duty at the time of the Learningsmith incident, Jette did not even have her radio with her. Thus, she was never in contact with Klevins. Any radio contact that may have occurred between Klevins and McCollum or Ortiz was minimal—essentially consisting of their telling Klevins when they were leaving the scene.

Both Jackson and Klevins, however, admit to being in radio contact with each other throughout the Learningsmith incident. Although the record is not entirely clear, the evidence indicates that the radio contact between Jackson and Klevins consisted of a series of "updates," rather than instructions. Jackson first called Klevins to advise him that this was a shoplifting incident and to find out what actions the merchant could take. (*See* Klevins Dep. at 152). Klevins called back and reiterated security guard policy with respect to shoplifting: only the merchants could detain or search the suspects; Jackson was merely to "stand by." (*Id.* at 154). Jackson acknowledged receiving this call. (*See id.*). After Eichhorn asked the young men to empty their pockets, Jackson again called Klevins to inform him that the merchant had conducted a search but found nothing. (*See id.* at 164). At the food court, Gallay asked Thorpe and Christian Allen to empty their pockets again. Klevins stated in deposition that he did not know that Gallay had conducted this second search. (*See id.*).

Allen alleges that Ortiz twice told her that she could not leave the vicinity until she was "released." Ortiz denies this. (*See* Ortiz Dep. at 129). For the purpose of ruling on this Motion, the Court will assume that Ortiz did detain Allen in this manner. Klevins stated in deposition, however, that he did not know of the detention and that such a detention would have been against policy. (*See* Klevins Dep. at 169). He stated that he did not instruct Ortiz or any security officer to detain the Allens or to later release them. (*See id.* at 168). Rather, he stated store policy which expressly forbade security officers from detaining suspects. The plaintiffs have offered no evidence to counter this assertion.

### 3. Analysis

 The plaintiffs assert that Klevins' radio contact with the defendant security

officers was sufficient to establish the "joint engagement" necessary for state action. For the following reasons, Court disagrees.

Klevins and the defendant security guards have provided the only evidence as to the content of the radio contacts. This uncontroverted evidence demonstrates that Klevins played no part in racial discrimination.[10] Not only did Klevins never instruct the security guards to search or seize the plaintiffs, but he restated Mall policy, which prohibited such actions. Klevins' participation at best can be characterized as that of a central dispatcher. Aside from reiterating Mall policy, the only active step Klevins took was to send Jackson to the store.

■ The plaintiffs argue that because Klevins must have had a sense of what was occurring, his lack of intervention made him a joint participant. The case law does not support this strained reading of joint action, however. Even the cases that the plaintiffs cite reveal that there cannot be state action unless a state officer is closely connected to the federal violation committed by a private citizen.

■ For example, a police officer engaged in joint action with a landlord in an eviction when he went alone to the tenants' home, informed them that the landlord was using proper eviction procedures, and advised them to abandon the premises. *See Howerton v. Gabica,* 708 F.2d 380, 381 (9th Cir.1983). Another police officer engaged in joint action with a private towing company when he summoned the towing

company, directed the company to tow the vehicle, notified the owner that his vehicle had been removed, and instructed the owner on how to claim the vehicle. *See Stypmann v. City and County of San Francisco,* 557 F.2d 1338, 1341 n. 4 (9th Cir.1977). Even if the Court assumes arguendo that constitutional violations occurred in the present case and that Klevins was aware of them, his involvement clearly does not rise to the level required for joint activity.[11]

The plaintiffs further argue that by wearing police-like uniforms, the security guards created an impression that they were state actors, aligned with the merchants. It is true that a shopper might perceive a security guard as supporting a store owner or employee. This perception alone, however, cannot create state action. The security guards offered their presence solely to ensure the physical safety of both merchants and patrons. The guards neither advised the merchants whether to make a search nor assisted them in doing so. (*See* Jackson Dep. at 41; Ortiz Dep. at 95).

■ The plaintiffs also seek to hold Columbia Mall liable under § 1983 on the grounds that its security guards acted pursuant to an unconstitutional policy and/or received insufficient training.[12] *See Monell v. Dept. of Social Services,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The record contains no evidence to support such a claim. Columbia Mall's policy prohibited its security guards from searching or detaining suspected shoplift-

---

10. It should be noted that Jackson, the security guard who Klevins dispatched to the scene, is himself African–American.

11. Klevins, moreover, had no duty to protect the plaintiffs from harm at the hands of the Learningsmith employees. *See DeShaney v. Winnebago County Dept., of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (holding that the Constitution does not require a state actor to protect a person from the actions of private parties unless the state has taken that person into custody). Because Klevins' contact with the Learningsmith de-

fendants was even more attenuated than that with the security guards, it is clear that the actions of the Learningsmith defendants cannot be considered state action.

12. Because there is no vicarious liability under § 1983, Columbia Mall can only be held liable for the actions of its security guards if they acted pursuant to an unconstitutional policy or received insufficient training. *See e.g. Revene v. Charles County Commissioners,* 882 F.2d 870, 874 (4th Cir.1989).

ers. (*See* Klevins Dep. at 95–98). The Mall policy is not per se unconstitutional as it does not authorize constitutional violations. *See Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir.1987).

■ The plaintiffs, moreover, cannot show that the existence of this policy was the proximate cause of constitutional violations. *See id.* at 1388 (explaining that a policy that is not unconstitutional per se must be shown to have been the proximate cause of the constitutional violation). The plaintiffs attempt to demonstrate this causality by providing the Court with copies of three complaints in other cases, allegedly arising from "false shoplifting" detentions at Columbia Mall. These complaints do not establish a pattern of illegal activity to support the plaintiffs' claims in the instant case. For a large mall such as Columbia, three incidents hardly demonstrate a pattern. Significantly, only one case alleges that the shoplifting detention was racially motivated. Furthermore, the record is silent as to the ultimate disposition of these cases. In short, the three cases are not the type of detailed statistical evidence that would constitute sufficient circumstantial proof of such a custom or practice. *See Dwares v. City of New York,* 985 F.2d 94, 100 (2nd Cir.1993).[13]

■ Finally, the plaintiffs argue that the Mall had sufficiently close contacts with the police to make it a state actor. This argument too is unavailing. Columbia Mall asked the Howard County Police Department to review its security plan. The Mall also instructed its guards to call the police at the behest of merchants and arranged for police officers to act as Mall security guards in the event of unexpected absences among its regular force. This is not the type of symbiotic relationship that would transform the Mall into a state actor. *See Jackson v. Pantazes,* 810 F.2d 426, 430 (4th Cir.1987).

For these reasons, the Court finds that there was no state action to support a § 1983 claim. Accordingly, the Court will grant the Mall defendants' Motion for Summary Judgment as to Count I and dismiss Count I as against all defendants.

### B. Counts II Through VII: State Tort Claims

With Count I dismissed, the Court no longer has original subject matter jurisdiction over this case.[14] Thus, the Court must decide whether to dismiss the state tort claims over which it had assumed supplemental jurisdiction.

■ The general rule is that "if the federal claims are dismissed before trial...the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Supreme Court has explained that this rule "simply recognizes that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). *See also Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir. 1994); *Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580 (5th Cir.1992) (holding that the trial court abused its discretion in retaining jurisdiction over state law claims after it had dismissed the federal claims).

---

13. Likewise, the plaintiffs merely assert that the security guards received insufficient training. The defendant security guards as well as Klevins and the defendants' expert witness, Leonard DeCarlo, testified that the guards received satisfactory training on shoplifting.

(*See e.g.* Jackson Dep. at 33; DeCarlo Report at 7).

14. Complete diversity does not exist; jurisdiction was founded on the federal question present in Count I.

■ Here, an analysis of judicial economy, convenience, fairness, and comity reveals that this Court should dismiss the state law claims. Although the Court has some hesitation over dismissing the state claims in a case that was filed in May 1996, the Court does not believe that dismissing Counts II through VII will prejudice any party.[15] The plaintiffs will be free to refile their state claims in state court.[16] Refiling in state court will not entail a significant expenditure of time or money. The parties can use the discovery they have already conducted for this case in state court. Similarly, with a few minor changes, the same Motion for Summary Judgment and opposition thereto can be filed in state court. Finally, the state courts are better suited than this Court to resolve the issues of state law in this case. Thus, the Court sees no compelling reason to depart from the general rule of dismissing pendent state law claims when the federal claims are dismissed before trial.

## IV. Conclusion

For the foregoing reasons, the Court shall, by separate Order, GRANT the Mall defendants' Motion for Summary Judgment as to Count I as against all defendants and DISMISS the case in its entirety. The plaintiffs are given leave to refile Counts II through VII of the Second Amended Complaint in state court.

---

15. Although this case was filed in May 1996, the plaintiffs amended the Complaint twice. The Court granted leave for the plaintiffs to file the Second Amended Complaint in June 1997.

16. Under Maryland Rule of Civil Procedure for Circuit Court 2–101(b), a Maryland Circuit Court will treat this action as timely filed if it is refiled in that court within 30 days of this dismissal.