Ford Motor v. Meredith Motor          CV-99-456-B    08/24/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Ford Motor Company**

    **v.**                                       Civil No. 99-456-B
                                                  Opinion No. 2000 DNH 187

**Meredith Motor Company, Inc.**


## MEMORANDUM AND ORDER

Meredith Motor Company, Inc. ("Meredith") brings counterclaims against Ford Motor Company ("Ford") for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), violation of the New Hampshire Motor Vehicle Franchise Act, Rev. Stat. Ann. chapter 357-C (Count III), and violation of the New Hampshire Consumer Protection Act, Rev. Stat. Ann. chapter 358-A (Count IV). Ford moves to dismiss Meredith's counterclaims for failure to state a claim. For the following reasons, I deny Ford's motion.

# I. Background[1]

Ford, an automobile manufacturer, sells its vehicles primarily through independent franchised dealers. Meredith is one such dealer. On or around June 1, 1972, Ford and Meredith entered into a standard Ford Sales and Service Agreement that incorporated by reference certain standard provisions.[2] At the time that the parties formed their agreement, the town of Plymouth, New Hampshire was included within Meredith's "dealer locality" or "relevant market area," two industry terms that

---

[1] Because Ford has moved to dismiss Meredith's counterclaims for failure to state a claim, I accept the well-pleaded facts marshaled by Meredith in support of its counterclaims as true and draw all reasonable inferences in Meredith's favor. See Miranda v. Ponce Fed. Bank, 948 F.2d 41, 43 (1st Cir. 1991).

[2] Because Ford has appended a copy of the parties' agreement to its complaint for declaratory judgment, and because Meredith's counterclaims refer to and depend upon the agreement (the authenticity of which has not been challenged), I may consider it without converting Ford's motion into one for summary judgment. See Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998).

refer to a dealer's sales territory.[3]

In July 1996, Ford proposed to relocate Fuller Ford ("Fuller"), another of its dealers, from Bristol, New Hampshire to New Hampton, New Hampshire. Meredith and two other New Hampshire Ford dealers filed an action in state court protesting the proposed relocation. After the suit was brought, Ford abandoned its plan to relocate Fuller to New Hampton.

Shortly thereafter, Ford told Fuller that it would award Fuller a new dealership in Plymouth, New Hampshire if Fuller demonstrated its commitment to such a move by purchasing a

---

[3] Under the parties' agreement, a "dealer's locality" is defined as "the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for COMPANY PRODUCTS." Compl. for Declaratory J. (Doc. #1), Exhibit A [hereinafter Agreement] ¶ 1(j). Under the New Hampshire Motor Vehicle Franchise Act, N.H. Rev. Stat. Ann. chapter 357-C, "relevant market area" is defined as "any area within the town or city where the motor vehicle dealer maintains his place of business or the area, if any, set forth in a franchise or agreement, whichever is larger." N.H. Rev. Stat. Ann. § 357-C:1, XXI (1995). The parties treat the two terms of art as synonymous for purposes of this action, and I do likewise.

facility in Plymouth.[4]  Fuller purchased a facility in Plymouth during the summer of 1997, when Plymouth was still part of Meredith's dealer locality.

In or around December 1997, Ford notified Meredith that it had redefined the dealer localities in its central New Hampshire market.  As a result, Plymouth was no longer included within Meredith's dealer locality.

On or about February 12, 1998, Ford notified Meredith that it was relocating Fuller to Plymouth.  On February 25, 1998, Meredith filed a protest action with the New Hampshire Motor Vehicle Industry Board, claiming that Ford's decision to relocate Fuller to Plymouth violated N.H. Rev. Stat. Ann. § 357-C:9. Meredith subsequently amended its protest action to add an

---

[4]  While Meredith alleged the facts set forth in this paragraph upon information and belief, see Meredith's Answer and Countercls. (Doc. #8) ¶¶ 68-69, the First Circuit has noted that in cases that do not implicate the heightened pleading standard under Federal Rule of Civil Procedure 9(b), "a plaintiff can make allegations either on the basis of personal knowledge or on 'information and belief.'"  Langadinos v. American Airlines, Inc., 199 F.3d 68, 73 (1st Cir. 2000) (emphasis in original).

allegation that Ford had redefined Meredith's dealer locality without good cause, in violation of N.H. Rev. Stat. Ann. § 357-C:3, III(o).

On September 28, 1999, Ford filed suit in this court, seeking a judgment declaring that chapter 357-C does not apply to the parties' agreement, or, in the alternative, that application of the statute to the agreement would violate the contract clauses of the state and federal constitutions and/or the due process clause of the Fourteenth Amendment.[5]  See Compl. for Declaratory J. (Doc. #1).  Meredith answered Ford's complaint and filed the four counterclaims at issue here.

The Board issued its decision in Meredith's protest action on August 16, 2000.  In that decision, the Board concluded that (1) Ford lacked good cause for redefining Meredith's dealer

_____

[5]  I rejected Ford's "statutory interpretation" and constitutional arguments in a separate memorandum and order denying Ford's motion for summary judgment and granting Meredith's cross-motion for summary judgement.  See Ford Motor Co. v. Meredith Motor Co., Inc., CV-99-456-B (D.N.H. Aug. 24, 2000).

-5-

locality or relevant market area, and (2) Ford lacked good cause for relocating Fuller to Plymouth. See Decision and Order of N.H. Motor Vehicle Industry Board, In re: Meredith Motors, Inc., Docket No. 0060 [hereinafter Board decision] at 24-25 (August 16, 2000).

## II.  Analysis

### A.  Meredith's Counterclaims Are Not Subject to the Colorado River Doctrine

Ford argues that under the doctrine developed by the Supreme Court in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), all four of Meredith's counterclaims should be dismissed in deference to Meredith's protest action before the Board.[6]  I disagree.

---

[6] Although the Board has decided the protest action in Meredith's favor, Ford has twenty days to apply to the Board for rehearing.  If Ford exercises this right, it may appeal to the superior court within 30 days after the Board rules on its application for rehearing.  See N.H. Rev. Stat. Ann. § 357-C:12, VII (Supp. 1999).  Because Ford has an appeal as of right from the Board's decision, the state proceeding continues to be concurrent with the action in this court.

As a general rule, a federal court is obligated to exercise the jurisdiction conferred upon it by Congress, even when there is a parallel action pending in another forum.  See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996); Colorado River, 424 U.S. at 817; Burns v. Watler, 931 F.2d 140, 145 (1st Cir. 1991).  In Colorado River, the Supreme Court developed a narrow exception to this rule.  Under this exception, a federal court may decline to exercise jurisdiction in deference to a parallel proceeding under certain "exceptional" circumstances.  See Colorado River, 424 U.S. at 818; Elmendorf Grafica, Inc. v. D.S. America (East), Inc., 48 F.3d 46, 50 (1st Cir. 1995).  Unlike the traditional doctrines of abstention, the Colorado River doctrine rests not on "considerations of proper constitutional adjudication and regard for federal-state relations," but on "considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'"  Colorado River, 424 U.S. at 817; see also Elmendorf Grafica, 48 F.3d at 50.

The Supreme Court and the First Circuit have provided a set of flexible factors for determining whether the exceptional circumstances required for application of the Colorado River doctrine are present. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23-27 (1983); Colorado River, 424 U.S. at 818; Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 320-21 (1st Cir. 1992); Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 947 F.2d 529, 532 (1st Cir. 1991). Before these factors can be applied, however, a court must first determine whether the concurrent actions in question are parallel. See Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir. 2000) ("The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits."); Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998) (same); Fox v. Maulding, 16 F.3d 1079, 1081 (10th Cir. 1994) (same); McLaughlin v. United Virginia Bank, 955 F.2d 930, 935 (4th Cir. 1992) (same). Concurrent actions need not be identical to be parallel. See Villa Marina, 947 F.2d at 533 (noting that

-8-

"perfect identity of issues is not a prerequisite for dismissal" under Colorado River doctrine); Interstate Material Corp. v. City of Chicago, 847 F.2d 1285, 1288 (7th Cir. 1988) ("[T]he requirement is of parallel suits, not identical suits."). Rather, suits brought in different forums are parallel if substantially the same parties are litigating substantially the same issues. See Al-Abood, 217 F.3d at 232; Dittmer, 146 F.3d at 118; Interstate Material, 847 F.2d at 1288. Concurrent actions that have certain facts and arguments in common, but raise different legal issues or seek different remedies, are not parallel for purposes of the Colorado River doctrine. See Al-Abood, 217 F.3d at 233; McLaughlin, 955 F.2d at 935; Flanders Filters, Inc. v. Intel Corp., 93 F. Supp.2d 669, 672 (E.D.N.C. 2000).

The Colorado River doctrine does not apply to Meredith's counterclaims for breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), and violation of chapter 358-A (Count IV) because none of those claims is

parallel to the concurrent state proceeding in question. Meredith's protest action before the Board, which was based solely on chapter 357-C, presented only two issues: (1) whether Ford had good cause to redefine Meredith's dealer locality, and (2) whether Ford had good cause to relocate Fuller to Plymouth. By contrast, Meredith's counterclaims for breach of contract and breach of the covenant of good faith and fair dealing involve legal issues not presented in the protest action before the Board. Meredith's counterclaim under chapter 358-A seeks a remedy -- treble damages, <u>see</u> Meredith's Answer and Countercls. (Doc. #8) ¶ 95 -- that was not available in its protest action before the Board. Accordingly, these three counterclaims are not parallel to the Board proceedings for purposes of the <u>Colorado River</u> doctrine.

Anticipating this lack of parallelism, Ford maintains that at a minimum the <u>Colorado River</u> doctrine counsels dismissal of Meredith's counterclaim under chapter 357-C (Count III), which raises the same issues as presented in the Board proceeding. I

am precluded, however, from dismissing the chapter 357-C counterclaim under the Colorado River doctrine because it includes a request for monetary damages, a form of relief that is not available to Meredith in the state proceeding. See id. ¶ 91; Quackenbush, 517 U.S. at 731 (concluding that dismissal on abstention grounds is not permissible when plaintiff is seeking damages); DeMauro v. DeMauro, 115 F.3d 94, 98 (1st Cir. 1997) (same). Because Ford has offered no viable reason other than the Colorado River doctrine in support of its motion to dismiss Meredith's counterclaim under chapter 357-C, Ford's motion is denied as to Count III.[7]

B.   **Meredith States a Claim for Breach of Contract**

In Count I, Meredith asserts that Ford breached the parties' agreement because Ford's decisions to redefine Meredith's dealer locality and to relocate Fuller to Plymouth were motivated by a

---

[7] As noted previously, see supra note 5, I rejected Ford's argument that chapter 357-C does not apply or cannot be applied to the parties' agreement in my memorandum and order denying Ford's motion for summary judgment and granting Meredith's cross-motion for summary judgment.

desire "to avoid possible legal action by Fuller concerning its disallowed relocation to New Hampton," rather than by "any valid economic reasons, justifiable policy or customer demands." See Meredith's Answer and Countercls. (Doc. #8) ¶ 75. Meredith's contract claim depends in large part on its interpretation of paragraph 9(a) of the parties' agreement, which reads as follows:

> **Representation Planning.** The Company reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for COMPANY PRODUCTS within or without the DEALER'S LOCALITY. In making such determinations, the Company from time to time conducts, to the extent deemed adequate by the Company and subject to the ready availability of information, studies of the locality, including such factors as its geographic characteristics, consumer shopping habits, competitive representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, UIO [units in operation], VEHICLE sales and registrations and COMPETITIVE and INDUSTRY CAR and TRUCK registrations.

Agreement ¶ 9(a). According to Meredith's interpretation of this paragraph, when making determinations regarding dealer locality and/or market representation, Ford must exercise its "best

-12-

judgment" in accordance with the factors listed in the second sentence of the paragraph. Meredith therefore contends that Ford breached its obligations under the agreement by redefining Meredith's dealer locality and/or relocating Fuller based on a desire to placate Fuller, rather than based on the enumerated factors.

Ford advances an alternative interpretation of paragraph 9(a). Under Ford's interpretation, its discretion to make the determinations described in the first sentence of the paragraph is not limited by the factors listed in the paragraph's second sentence. According to Ford, while the paragraph indicates that Ford is free to conduct market studies that focus on the enumerated factors, it neither obligates Ford to conduct such studies nor requires Ford to make the determinations described in the first sentence of the paragraph in accordance with such factors.[8]

---

[8] Ford's interpretation arguably receives additional support from the agreement's definition of a "dealer's locality" as "the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and

-13-

Ford also points to another provision of the agreement, paragraph 9(c), to support its contention that it has broad discretion to relocate dealers.  Paragraph 9(c) provides in relevant part that

> The Company [i.e., Ford] shall have the right to appoint additional dealers in VEHICLES within or without the DEALER'S LOCALITY except that, if an additional dealer will be within the DEALER'S LOCALITY and within ten (10) miles driving distance of the dealer's principal place of business, the Company shall not appoint the additional dealer unless a study made pursuant to subparagraph 9(a) reasonably demonstrates, in the Company's opinion, that such appointment is necessary to provide VEHICLES with proper sales and service representation in such locality with due regard to the factors referred to above in subparagraph 9(a).

Agreement ¶ 9(c).  Ford argues that under this paragraph, it has unbridled discretion to locate new dealers inside or outside an existing dealer's dealer locality, unless the new dealer is to be located both within the existing dealer's dealer locality and within ten miles of the existing dealer.  Ford maintains that its obligation to act in accordance with the factors listed in the

_____

service responsibility for COMPANY PRODUCTS."  Agreement ¶ 1(j).

-14-

second sentence of paragraph 9(a) only attaches when it is placing a new dealer within the protected ten-mile zone.

I interpret the parties' agreement under Michigan law.[9] Michigan interprets contracts under the plain meaning rule. See In re Arbors of Houston Assocs. Ltd. Partnership, 172 F.3d 47, No. 97-2099, 1999 WL 17649, at *3 (6th Cir. Jan. 4, 1999) (table; text available on Westlaw); Kukowski v. Piskin, 297 N.W.2d 612, 613 (Mich. Ct. App. 1980), aff'd, 327 N.W.2d 832 (Mich. 1982). Under that rule, if contract language is unambiguous, then its construction is a matter of law for the court and the language must be given its plain meaning. See Ford Motor Co. v. Northbrook Ins. Co., 838 F.2d 829, 832 (6th Cir. 1988) (applying

---

[9] The agreement provides that the parties intend it to be construed in accordance with Michigan law. See Agreement ¶ 32. New Hampshire recognizes such choice of law provisions when the contract bears a significant relationship to the jurisdiction whose law is designated as the rule of decision. See Allied Adjustment Serv. v. Heney, 125 N.H. 698, 700 (1984). Here, the requisite relationship is present because Ford has its principal place of business in Michigan. See Compl. for Declaratory J. (Doc. #1) ¶ 3. The parties do not dispute that Michigan law applies to their agreement.

Michigan law); <u>Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist.</u>, 550 N.W.2d 228, 237 (Mich. 1996); <u>Schroeder v. Terra Energy, Ltd.</u>, 565 N.W.2d 887, 896 (Mich. Ct. App. 1997) (citing <u>G & A Inc. v. Nahra</u>, 514 N.W.2d 255, 256 (Mich. Ct. App. 1994)); <u>Orley Enters., Inc. v. Tri-Pointe, Inc.</u>, 522 N.W.2d 896, 898 (Mich. Ct. App. 1994). "Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." <u>Port Huron Educ. Ass'n</u>, 550 N.W.2d at 237.

In the present case, I determine that Meredith's interpretation of Ford's obligations under paragraph 9(a) is reasonable.[10] I need not decide at this point whether Ford's

---

[10] My conclusion that Meredith has offered a reasonable interpretation of the language of ¶ 9(a) is in no way based on Meredith's argument under <u>In re Ten Mile Relief Drain</u>, 123 N.W.2d 719 (Mich. 1963). <u>Ten Mile Relief Drain</u> is inapposite because it involved interpretation of the discretion delegated to an administrative board under state statute. Statutory interpretation differs from the interpretation of contract language. <u>See</u> <u>Major Oldsmobile, Inc. v. General Motors Corp.</u>, 93 CIV. 2189 (SWK), 1995 WL 326475, at *4 (S.D.N.Y. May 31, 1995) ("The legal standards applicable to issues of statutory interpretation have evolved separately from those involving matters of contract interpretation."), <u>aff'd</u>, 101 F.3d 684, No. 95-7595, 1996 WL 280452 (2d Cir. May 17, 1996) (table; text available on Westlaw); Margaret N. Kniffen, <u>Corbin on Contracts</u> §

alternative interpretation of that provision is also reasonable.

If both interpretations are reasonable, then the provision is

ambiguous and its meaning becomes a question of fact that cannot

be resolved on a motion to dismiss.  If, on the other hand, only

Meredith's interpretation is reasonable, then Ford's only

surviving objection to Meredith's contract claim is undermined.

In either instance, Meredith's counterclaim survives Ford's

motion. Accordingly, I deny Ford's motion as to Count I.[11]

_____

24.2 (rev. ed. 1998) ("[T]he task of interpreting legislation
usually differs from that of interpreting a contract.").

[11]  Meredith also seeks to buttress its counterclaim for
breach of contract with language contained in the preamble to the
agreement.  The language upon which Meredith relies reads as
follows: "[T]he Company [i.e., Ford] endeavors to provide each of
its dealers with a reasonable profit opportunity based on the
potential for sales and service of COMPANY PRODUCTS within his
locality."  Preamble to Agreement at ii.  Ford contends that such
language is merely prefatory and cannot give rise to a legally
binding obligation.  While I have already determined that Ford's
motion must be dismissed as to Count I, and therefore need not
resolve whether language in the agreement's preamble supports
Meredith's counterclaim, I note that Michigan law on this issue
is not as simple as Ford suggests.  Rather, Michigan law seems to
suggest that, at least in certain circumstances, such "recitals"
may be relevant to interpreting otherwise ambiguous contract
provisions.  See Acme Cut Stone Co. v. New Center Dev. Corp., 274
N.W. 700, 705 (Mich. 1937).

-17-

**C.  Meredith States a Claim for Breach of the Implied Covenant of Good Faith**

In Count II, Meredith alleges that its agreement with Ford includes an implied covenant of good faith that obligates Ford to redefine Meredith's dealer locality "only for valid economic reasons and/or customer demands."  Meredith's Answer and Countercls. (Doc. #8) ¶ 80.  According to Meredith, Ford breached the covenant because it redefined Meredith's dealer locality and relocated Fuller based on its desire to avoid a potential lawsuit by Fuller.  See id. ¶ 81.

Michigan law recognizes an implied covenant of good faith only in limited circumstances.  See Clark Bros. Sales Co. v. Dana Corp., 77 F. Supp.2d 837, 852 (E.D. Mich. 1999) (noting that implied covenant "cannot form the basis for a claim independent of that contract"); Van Arnem Co. v. Manufacturers Hanover Leasing Corp., 776 F. Supp. 1220, 1223 (E.D. Mich. 1991) (same). A covenant of good faith will be implied "[w]here a party to a contract makes the manner of its performance a matter of its own discretion."  Burkhardt v. City Nat'l Bank of Detroit, 226 N.W.2d

678, 680 (Mich. Ct. App. 1975); see also Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 877 (5th Cir. 1989) (applying Michigan law); Paradata Computer Networks, Inc. v. Telebit Corp., 830 F. Supp. 1001, 1005, 1006 (E.D. Mich. 1993) (observing that "discretion is the hallmark of the covenant"); Ferrell v. Vic Tanny Int'l, Inc., 357 N.W.2d 669, 672 (Mich. Ct. App. 1984) (per curiam).

In Burkhardt, the court considered whether a contract between mortgagors and their mortgagee bank included an implied covenant of good faith. The contract established accounts into which the mortgagors were required to contribute an amount estimated by the bank to be sufficient to pay the mortgagors' taxes and insurance premiums. The contract, however, did not specify the accounting method the bank would use to make such estimates. See Burkhardt, 226 N.W.2d at 679. The mortgagors argued that the contract included an implied covenant of good faith and that the accounting method the bank employed violated the covenant. See id. Although the court found no evidence of

bad faith, it concluded that the covenant of good faith attached to the parties' contract because it gave the mortgagee bank a "considerable amount of discretion in the evaluation of the sum necessary to provide an adequate and available fund from which to pay taxes and insurance premiums." Id. at 80.

The implied covenant serves a "supplementing function" and is intended to protect the parties' reasonable expectations under the contract. See Hubbard Chevrolet Co., 873 F.2d at 876-77. Accordingly, Michigan law will not imply a covenant of good faith "where parties have unmistakably expressed their respective rights." Id. at 877 (internal quotation marks and citation omitted). In other words, the covenant cannot be employed to "override express contract terms." Cook v. Little Caesar Enters., Inc., 210 F.3d 653, 657 (6th Cir. 2000); Clark Bros. Sales Co., 77 F. Supp.2d at 852; Van Arnem Co., 776 F. Supp. at 1223.

Whether the implied covenant of good faith even comes "into play" in this case depends upon the language of Meredith's

agreement with Ford.  See Hubbard Chevrolet Co., 873 F.2d at 877

(finding that the covenant did not attach).  Meredith has

identified language in the contract to which it argues the

implied covenant of good faith attaches.  In particular,

paragraphs 9(a) and 9(c) of the agreement could be interpreted to

mean that the manner of Ford's performance with respect to

determinations of dealer locality and dealer relocation is a

matter of Ford's discretion.[12]  Under this reading of the

contract, Ford must exercise "honestly and in good faith,"

_____

[12]  At the pleadings stage, Meredith is entitled to take inconsistent positions in Counts I and II regarding the interpretation of the agreement's language.  See Fed. R. Civ. P. 8(e)(2); Allied Vision Group, Inc. v. RLI Prof'l Techs., Inc., 916 F. Supp. 778, 782 (N.D. Ill. 1996) (explaining that Rule 8(e)(2) allows inconsistency between claims, but not inconsistency within a single claim).  At some point Meredith may be required to elect "a theory of its case that is internally consistent."  See Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., 148 F.R.D. 25, 50 (D.N.H. 1993); see also Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1555 (1st Cir. 1994) ("Because procedural law allows alternative contentions, parties to a civil action involving such an array of factual and legal theories as this case presents may be allowed to defer choice at least until late stages of proceedings in the trial court.").

see Burkhardt, 226 N.W.2d at 680, its discretion to determine (1) when it will examine market representation in a dealer's locality; (2) whether, and to what extent, it will conduct market studies before making a decision about market representation; and (3) whether it will appoint additional dealer(s) within the dealer's locality. See Agreement ¶¶ 9(a), 9(c).

In addition to alleging sufficient facts to "bring the covenant into play," Meredith has alleged sufficient facts to support an allegation that Ford acted in bad faith. Bad faith is defined as "'arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty.'" Maida v. Retirement and Health Servs. Corp., Nos. 93-1625, 93-1635, 1994 WL 514521, at *5 (6th Cir. Sept. 19, 1994) (per curiam) (citation omitted). Evidence of dishonesty or fraud, however, is not necessary to establish bad faith. See id. Meredith has alleged that Ford acted with indifferent or intentional disregard for its interests when Ford acted to advance the interests of another dealer (Fuller) and to protect its own interests without regard

to the negative impact those actions would have on Meredith.

Because Meredith has identified contract language to which an implied covenant of good faith could attach and has alleged facts that would support an inference of bad faith, I deny Ford's motion with respect to Count II.[13]

## D.    Ford's Alleged Conduct Is Not Exempted Under RSA § 358-A:3, I

Ford argues that Meredith's counterclaim under chapter 358-A (Count IV) must be dismissed because it is barred by § 358-A:3, I, which exempts from the scope of the Consumer Protection Act transactions that constitute "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of [New Hampshire] or of the United States."  N.H. Rev. Stat. Ann. § 358-A:3, I (1995).  Because Ford's argument directly conflicts with the interpretation given to the exemption by this court and the New

_____

[13]    Because I find that Meredith has alleged sufficient facts to withstand Ford's motion to dismiss, I express no opinion on Meredith's alternative argument that the parties' contract includes an express covenant of good faith.

Hampshire Supreme Court, I reject it.

Meredith's chapter 358-A counterclaim against Ford is not barred simply because Ford is subject to the specialized regulatory scheme created under chapter 357-C.[14]  See Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., 148 F.R.D.

---

[14]  In New Hampshire Automobile Dealers Association, Inc. v. General Motors Corp., 620 F. Supp. 1150 (D.N.H. 1985), aff'd in part, vacated in part on other grounds by 801 F.2d 528 (1st Cir. 1986), Chief Judge Devine determined that the plaintiffs were limited to bringing claims against the defendant automobile manufacturer under chapter 357-C, and were not entitled to seek relief under chapter 358-A.  See id. at 1160.  In the absence of any applicable precedent from New Hampshire, Chief Judge Devine followed the Massachusetts Supreme Judicial Court's decision in Reiter Oldsmobile, Inc. v. General Motors Corp., 393 N.E.2d 376 (Mass. 1979), which interpreted analogous Massachusetts statutes. Thereafter, in Gilmore v. Bradgate Associates, Inc., 135 N.H. 234 (1992), the New Hampshire Supreme Court held that the existence of a regulatory body charged with overseeing certain standards in a defendant's industry did not necessarily immunize the defendant from liability under chapter 358-A.  See id. at 238-39.  A year later, Judge McAuliffe of this court relied on Gilmore to conclude that the existence of chapter 357-C did not preclude a claim against an automobile manufacturer under the more general terms of chapter 358-A.  See Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., 148 F.R.D. 25, 47-48 (D.N.H. 1993).  As indicated in the text, I conclude that Gilmore and Nault's represent the correct view of the relationship between chapters 357-C and 358-A.

25, 48 (D.N.H. 1993) ("The mere existence of legislation aimed at regulating a particular industry does not necessarily preclude an action under the Consumer Protection Act against individuals operating within that industry."); cf. Therrien v. Resource Fin. Group, Inc., 704 F. Supp. 322, 328-29 (D.N.H. 1989) (holding that provisions of federal Truth in Lending Act do not preclude a chapter 358-A action against lender); WVG v. Pacific Ins. Co., 707 F. Supp. 70, 72-73 (D.N.H. 1986) (holding that provisions of New Hampshire Unfair Insurance Trade Practices statute do not preclude a chapter 358-A action against insurer).  Similarly, the mere existence of an administrative body such as the Board does not immunize a defendant subject to that body's authority from suit under chapter 358-A.  See Gilmore v. Bradgate Assocs., Inc., 135 N.H. 234, 238-39 (1992) ("The mere existence of a regulatory body to oversee certain standards of an industry does not remove all acts and practices of that industry from the provisions of the Consumer Protection Act.").[15]

_____

[15]  Ford's reliance on Rousseau v. Eshleman, 128 N.H. 564 (1986), reconsideration denied, 129 N.H. 306 (1987), which held

Furthermore, Ford misapprehends the meaning of the exemption provided in § 358-A:3, I. As both the New Hampshire Supreme Court and this court have explained, the applicability of this exemption turns on whether the specific conduct challenged by a plaintiff is "otherwise permitted" by an authorized regulatory board or officer, not on whether the defendant's business or industry is subject to regulation by such an authority. The New Hampshire Supreme Court has adopted the following interpretation of the exemption:

> [T]he plain meaning of the exemption is that transactions deemed lawful by other laws of New Hampshire or of the United States will be exempt from the provisions of RSA chapter 358-A. This construction of the act focuses on the act which is alleged, rather than the industry regulated, and requires the conduct to be permitted by a regulatory board or officer under another statute, in order for the RSA 358-A:3, I, exemption to apply. According to this theory, the exemption will apply where a party attempts to label as

that an attorney's practice of law does not fall within the scope of chapter 358-A, is unavailing. The New Hampshire Supreme Court has since limited the reasoning of Rousseau to "the context of attorneys, whose individual conduct and practice is subject to a comprehensive regulatory and disciplinary framework under the jurisdiction of the [New Hampshire Supreme Court]." Gilmore, 135 N.H. at 238.

-26-

> fraud, deceit or misrepresentation conduct which is
> "otherwise permitted" under laws administered by
> regulatory boards or officer's [sic] acting under the
> statutory authority of this State or the United States.

Gilmore, 135 N.H. at 238.  This court has similarly concluded

that

> The plain meaning of the exemptive section of the
> Consumer Protection Act is that transactions permitted
> under other laws of New Hampshire or the United States
> will not be deemed illegal under RSA ch. 358-A.
> Conversely, if transactions are not permitted under
> other laws, either expressly or impliedly, then they
> are subject to regulation under the Consumer Protection
> Act.  The goal of the legislature would seem to
> encompass avoidance of a direct conflict with a
> regulatory scheme.  Under RSA ch. 358-A:3, I the issue
> is whether a transaction is "otherwise permitted," and
> not whether an agency exists to review the transaction.

WVG, 707 F. Supp. at 72.  This narrow reading of the exemption is

consistent with the New Hampshire Supreme Court's relatively

expansive interpretation of chapter 358-A's reach.  See Gilmore,

135 N.H. at 238 (describing the New Hampshire Consumer Protection

Act as "a comprehensive statute designed to regulate business

practices for consumer protection") (quoting Chase v. Dorais, 122

N.H. 600, 601 (1982)) (internal quotation marks omitted).

Ford's contention that the exemption applies to Meredith's counterclaim under chapter 358-A fails because Ford has not demonstrated (and cannot demonstrate) that the specific conduct of which Meredith complains -- i.e., the relocation of Fuller to Plymouth and the redefinition of Meredith's dealer locality -- is "otherwise permitted" under chapter 357-C as administered by the Board. To the contrary, the Board has determined under chapter 357-C that Ford lacked good cause for the two challenged actions. See Board decision at 24-25. Because the exemption does not apply, Meredith has stated a cognizable claim under chapter 358-A. Accordingly, Ford's motion is denied as to Count IV.

## III.  Conclusion

For the reasons set forth above, Ford's motion to dismiss Meredith's counterclaims (Doc. #12) is denied.[16]

---

[16] Because I have denied Ford's motion for the reasons stated herein, I need not address whether the timing of Ford's declaratory judgment action evidences bad faith or an unfair or deceptive practice in support of Counts II, III, and/or IV. See Meredith's Answer and Countercls. (Doc. #8) ¶¶ 78, 82, 90.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge


August 24, 2000

cc:  James E. Higgins, Esq.
     Nicholas T. Christakos, Esq.
     Gregory A. Holmes, Esq.