Colonial Imports v. Volvo          CV-98-342-B    01/09/01
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE


Colonial Imports Corporation
d/b/a Volvo of Nashua

        v.                              Civil No. 98-342-B
                                        Opinion NO. 01DNH008
Volvo Cars of North America, Inc.


                    MEMORANDUM AND ORDER

     Colonial Imports Corporation, a retail automobile dealership

owned and operated by Wilfrid Piekarski, alleges that Volvo Cars

of North America, Inc., a distributor of automobiles, automobile

parts, and accessories, violated the New Hampshire Motor Vehicle

Franchise Act, N.H. Rev. Stat. Ann. § 357-C:1 *et seq.*, by

instituting a flawed dealer incentive program and then

administering that program to the financial detriment of

Colonial.  Colonial also asserts various other state law claims

for relief based on this same course of conduct.  I have before

me Volvo's motion for summary judgment, (Doc. No. 39).  For the

reasons set forth below, I grant Volvo's motion.

# I.  BACKGROUND[1]

In 1986, Colonial entered into an agreement with Volvo to sell and service its automobiles.  The parties' business relationship initially appeared to be successful.  Colonial was consistently one of Volvo's top dealers in New England in terms of sales volume during the 1990's.  This sales volume, combined with Colonial's high scores on customer satisfaction surveys, enabled Colonial to receive $2,200,000 in cash incentive payments under Volvo's "Dealer of Excellence" program between 1992 and 1995.

## A.    The Partnering for Excellence Program

Volvo began to experience a downturn in its business during the early 1990s.  Competition increased during this period, sales dropped from the record highs of the 1980's, and profits declined.  J.D. Power & Associates, a leading automobile industry analyst, ranked Volvo in the bottom quartile of the industry for customer satisfaction.  Moreover, Volvo's competitors began to aggressively upgrade their facilities and dealership staff.

---

[1]  I describe the background facts in the light most favorable to Colonial, the nonmoving party.

In 1996, in response to this competitive environment, Volvo encouraged its dealers to improve their facilities, hire new employees and/or extensively retrain old employees through a program known as "Partnering for Excellence" ("PFE"). The goal of the PFE program was to improve Volvo's J.D. Power customer satisfaction ratings and, ultimately, its sales.

Volvo recognized that the improvements it wanted would place a serious financial burden on its dealers. As an incentive to encourage dealers to upgrade their facilities and staff, the PFE program provided that a dealer could receive cash awards, in addition to those available under the Dealer of Excellence program, for every Volvo sold. In order to be eligible for PFE awards a dealer had to: (1) comply with certain facility and personnel standards set by Volvo; and (2) maintain a customer satisfaction index ("CSI") rating of 83 in showroom satisfaction and 70 in service satisfaction for each month during a six-month period.[2] There were two PFE periods: January 1st to June 30th

_____

[2] The CSI thresholds for the PFE program were at least as high as those for the Dealer of Excellence program. Dep. of Peter Butterfield, Ex. 1 to Aff. of W. Piekarski (hereinafter "Piekarski Aff."), submitted with Pl.'s Obj. to Def.'s Mot. for Summ. J., (Doc. No. 41), at 124-25. Thus, if a dealer qualified for a PFE award, he most likely qualified for a Dealer of

and July 1st to December 31st.

### 1. CSI Ratings

Under both the PFE program and the Dealer of Excellence program, CSI ratings for showroom and service satisfaction were determined by customers' responses to surveys conducted by a private contractor, Audits & Surveys Worldwide. Audits & Surveys surveyed all Volvo customers who recently had purchased or leased a new Volvo or who recently had had their Volvo serviced by a Volvo dealer. PFE Section II §§ 3.1, 3.5, 4.1, 4.5.[3] The survey's initial questions were "screening questions" intended to establish that the proper person was being interviewed. PFE Section II §§ 3.5, 4.5. Customers were then asked thirteen showroom-related questions or fifteen service-related questions about their experience with their Volvo dealer.[4] PFE Section II

---

Excellence payment as well.

[3] "PFE Section II" refers to "Section II - The Volvo Excellence Program Rules and Regulations" of the Partnering for Excellence documents submitted as Tab 8 in the Appendix (hereinafter "Def.'s App.") to Volvo's motion for summary judgment, (Doc. No. 39).

[4] Customers also were asked a number of supplemental questions that served "as a diagnostic tool to provide a better understanding of customer expectations." PFE Section II §§ 3.7, 4.7. Answers to these supplemental questions did not count

§§ 3.6, 4.6. Customers were instructed to select from a range of acceptable responses such as excellent, very good, good, fair, or poor. PFE Section II §§ 3.6-.8, 4.6-.8.

A customer's answer for each survey question was assigned a numerical rating on a scale of zero to eight. PFE Section II §§ 3.8, 4.8. For example, an answer of "excellent" rated an 8 while an answer of "very good" rated a 4, a "good" rated a 2, a "fair" rated a 1, and a "poor" rated a 0. Id. The numerical ratings for the answers provided by all of the dealer's customers were then added together to determine its overall score. Id. Next, the total number of answers given by all of the dealer's customers for each question was determined and multiplied by eight, the highest score possible for an individual question, to identify the dealer's maximum achievable score for that question. Id. For example, if fifty-four answers were received to a particular question, fifty-four was multiplied by eight to determine that the maximum possible score that a dealer could receive on that question was 432. PFE Section II §3.8 (chart). The maximum achievable scores for each question were then added

towards the dealer's CSI rating. Id.

together to determine the maximum overall achievable score. <u>PFE Section II</u> §3.8. Finally, the dealer's overall score was divided by the maximum overall achievable score to obtain its showroom or service CSI rating. <u>Id.</u>

To determine the value of a dealer's PFE award, showroom and service CSI ratings were each converted into a dollar value according to a sliding scale.[5] <u>PFE Section II</u> § 5.4. The two dollar values were then added together and multiplied by the number of eligible cars sold.[6] <u>Id.</u> The higher the scores, the higher the dealer's PFE award; a dealer could receive up to $1,500 for each eligible new car sold. <u>Id.</u>

## 2. **The PFE Program's Impact on Dealers**

Volvo's decision to tie CSI scores directly to cash incentives proved to be controversial, in large part because CSI ratings were based on the results of subjective surveys. As dealers became dependent on Dealer of Excellence and PFE

---

[5] For example, the threshold service CSI rating of 70 has a dollar value of $100 while a perfect 100 rating has a dollar value of $750. <u>PFE Section II</u> § 5.4.

[6] Volvo set forth a number of rules to determine whether a a car sale is eligible to be included in this multiplier. <u>See PFE Section II</u> §§ 5.1-.3.

payments, the temptation to manipulate survey results increased. Volvo became aware, as early as 1993, that some dealers were coaching, even bribing, customers to ensure favorable survey responses to Dealer of Excellence surveys. See Mem. from Franson to Dealer Principals of 07/02/1993, Ex. 10 to Piekarski Aff. Other dealers falsified customer information to ensure that disgruntled customers would never be surveyed. While Volvo informed its dealers that such practices were impermissible, it did little else to remedy the problem.

Volvo did not require its dealers to participate in the PFE program. Nevertheless, the prospect of receiving PFE payments in addition to Dealer of Excellence payments was too enticing for dealers to pass up. Participating dealers obtained a significant competitive advantage: they could simultaneously upgrade their facilities and staff while charging lower prices in anticipation of PFE award money.

### 3. Colonial Enters the PFE Program

Colonial entered the PFE program in January 1996, and agreed to comply with the rules for the program established by Volvo. Dep. of Wilfrid Piekarski (hereinafter "Piekarski Dep."), Def.'s App. Tab 2, at 94-96. Colonial decided to use its anticipated

PFE awards to help finance the relocation of its Volvo franchise to a new location on the Daniel Webster Highway in Nashua, New Hampshire (the "New Facility"). Piekarski, in his own name, signed a purchase and sale agreement for the New Facility on April 28, 1996, at a cost of $2,600,000. The closing was set for June 28, 1996, and Piekarski put down a $25,000 non-refundable deposit. Colonial planned to spend an additional $400,000 to renovate the New Facility.

Colonial also operated a Toyota dealership at a different site in Nashua. At the same time that it was negotiating to purchase the New Facility, Colonial made a commitment to Toyota that it would convert its existing Volvo site into a Toyota truck dealership.

## B. Colonial's CSI Ratings Fall Below PFE Minimums

Prior to either of these negotiations, Colonial began to consider a significant personnel decision. Piekarski had become increasingly disenchanted with the performance of his general manager and son-in-law, Richard Lovering. During Lovering's December 1995 performance review, Piekarski informed him of the possibility that he might be replaced as general manager. Piekarski ultimately placed Lovering on a leave of absence in

-8-

March 1996.  Lovering resigned shortly thereafter.

Lovering subsequently purchased a dealership in Concord, New Hampshire, that carried both Isuzu and Volvo vehicles.  He began operations in Concord in May 1996 and proceeded to hire six experienced Colonial employees, including his father and brother. Piekarski Dep. at 167-72.

On June 28, 1996, the Purchase and Sale Agreement for the New Facility expired and Piekarski forfeited his deposit.[7]  Two days later, the first period for the 1996 Dealer of Excellence and PFE programs ended.  Colonial received approximately $189,000 in payments under these programs for this period.  Def.'s Stmt. of Undisputed Material Facts (hereinafter "Def.'s Stmt."), submitted with Def.'s Mot. for Summ. J., (Doc. No. 39), ¶ 45; Pl.'s Obj. to Def.'s Stmt., (Doc. No. 43), ¶ 45.

---

[7]  Volvo asserts that Piekarski decided not to purchase the New Facility and knowingly forfeited the $25,000 deposit. Colonial contends that Piekarski's relationship with the seller was such that he did not ask for a formal extension but checked periodically on the availability of the property after June 28, 1996.  Piekarski Dep. at 106, 291-92.  In essence, Piekarski suggests that he had an informal understanding with the seller that effectively gave him a right of first refusal or an ongoing option to purchase the New Facility.  See id.  Colonial further asserts that its decision not to purchase the New Facility was the result of Volvo's "bad faith conduct" towards Colonial.

The departure of Lovering, and the other key employees who went to work for him, caused Colonial's CSI ratings to drop during the second half of 1996. Showroom satisfaction dropped to the upper 70's, below the threshold score of 83, beginning in July. Letter from W. Piekarski to Butterfield of 01/21/1997 (hereinafter the "Appeal Letter"), Ex. 19 to Piekarski Aff. Service satisfaction dipped to 69.6 for the month of September, just below the threshold of 70. Id. Volvo sales representatives warned Colonial in the summer of 1996 that it was in danger of not receiving any PFE payments because of the drop in its CSI ratings. Piekarski Dep. at 291. Circumstances did not improve during the remainder of the year. Thus, Colonial did not qualify for any PFE money during the second half of 1996.

## C.  Colonial's Appeal

The PFE program provided for appeals by dealers who "require[d] a variance on a rule or contest[ed] a judgment or violations." PFE Section II § 1.7. The PFE manual states that before preparing an appeal, a dealer should ask the following four questions:

> (1) "Does the issue being raised have a material effect on the results of the [PFE] award?"

(2) "Does the issue pertain to the rules of the program? (If the issue concerns the design or methodology of [the PFE program], it is not suitable for appeal.)"
(3) "Have the rules been applied unfairly? (If rules of the program have been administered fairly, the issue is not suitable for appeal.)"
(4) "Has a situation occurred which places the [dealer] in an unfair disadvantage? (i.e. natural disasters.)"

Id. Volvo's Retail Audit Appeal Committee (the "Appeal Committee"), comprised of Volvo representatives and dealers, considered dealer appeals and then forwarded its decision, along with an explanation, to the dealer. PFE Section II §§ 1.7, 7.1. The PFE manual states that "[i]n all appeals and other matters relating to the interpretation and application of any rule or aspect of the [PFE] Program, the decision of Volvo shall be final." PFE Section II § 1.7.

Colonial requested an exception to the minimum CSI standards because it felt that the departure of Lovering, and the key employees who subsequently went to work for him, put Colonial at an unfair disadvantage. See Appeal Letter. The Appeal Committee considered Colonial's appeal and ultimately denied it, without explanation, by letter dated April 16, 1997.[8]

---

[8] Volvo asserts that the Appeal Committee denied Colonial's appeal "after concluding that retailers are responsible for management during personnel changes." Aff. of Peter Butterfield

Two months before the Appeal Committee rejected the appeal, Colonial formally requested that Toyota approve the proposed relocation of its Toyota truck franchise to the current Volvo site. In its letter to Toyota, Colonial stated that it intended to either sell or terminate the Volvo franchise by April 17th. Letter from W. Piekarski to Norton of 02/11/1997, Def.'s App. Tab 13. In the interim, Colonial was in somewhat of a bind. It had promised Toyota that it would use its existing Volvo site exclusively for Toyota trucks but, since Piekarski had not purchased the New Facility, it had no other location for the Volvo dealership.

Colonial initially attempted to balance the competing needs of both dealerships by combining them at its current site. It soon began, however, to refuse some shipments of Volvo inventory it had previously ordered. After Volvo denied Colonial's appeal, Colonial decided to stop accepting all shipments of new Volvos, but offered to continue servicing existing customers. Piekarski Dep. at 265.

_____

("Butterfield Aff."), submitted with Def.'s Mot. for Summ. J., (Doc. No. 39), ¶ 12.

On March 6, 1997, Colonial told Volvo that it had Colonial's consent to "discuss and present to us potential buyers" for their Volvo dealership. Letter from W. Piekarski to Hauge of 03/06/1997, Def.'s App. Tab 14. Colonial explained, however, that "[n]ew facilities will be required as we intend to operate our Toyota Truck Center in the present Volvo facility." Id. On April 4, Toyota approved the relocation of the franchise to the Volvo site on the condition that the Volvo franchise would be moved to a different location.

On April 18, 1997, two days after Volvo denied Colonial's appeal, it informed Colonial that it was in default under the Sales Agreement for refusing delivery of its allocation of new Volvos. Letter from Butterfield to W. Piekarski of 04/18/1997, Def.'s App. Tab 16. Volvo requested that Colonial cure these defaults by June 26th, but Colonial did nothing. By letter dated June 30, 1997, Volvo notified Colonial that it was terminating the Sales Agreement, effective October 3, 1997. Letter from Butterfield to W. Piekarski of 06/30/1997, Def.'s App. Tab 17.

D. **The Grace Period**

On June 5, 1997, Volvo notified all dealers that it was modifying the PFE program to include a "grace period." Under

this modification, dealers with a proven track record in satisfying customers would receive PFE payments even if their scores fell below the threshold for one period. On June 26, 1997, Volvo sent Colonial a check in the amount of $142,100. Letter from Hauge to W. Piekarski of 06/26/1997, Ex. 22 to Piekarski Aff. Volvo's letter to Colonial described the enclosed check as payment in satisfaction of Colonial's second-half 1996 PFE awards, in accordance with the newly instituted grace period. Id.

Prior to the scheduled termination date of the Sales Agreement, Colonial transferred whatever interest it had in the Volvo franchise to Mr. Piekarski's daughter, Linda Lovering. Volvo ultimately approved Mrs. Lovering, the wife of Colonial's former general manager, as the new dealer. She began operating from the New Facility in March, 1998.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that no genuine issues of material fact exist and that the moving party

is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94-95 (1st Cir. 1996).  A material fact is one "that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena, 95 F.3d at 94 (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249).  I apply this standard in ruling on Volvo's motion for summary judgment.

## III.  DISCUSSION

Colonial asserts claims for (1) violation of the Motor Vehicle Franchise Act, N.H. Rev. Stat. Ann. 357-C:1 *et seq.*; (2) breach of the covenant of good faith and fair dealing implied by law in the Sales Agreement between Volvo and Colonial; (3) violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. 358-A:1 *et seq.*; (4) tortious interference with prospective business relations; (5) negligent misrepresentation; and (6) intentional misrepresentation.  I examine Volvo's challenges to these claims in the sections that follow.

### A.    The Motor Vehicle Franchise Act

New Hampshire's Motor Vehicle Franchise Act provides that it is unlawful for any

> manufacturer, factory branch, factory representative, distributor, distributor branch, distributor representative, or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any such parties or to the public.

N.H. Rev. Stat. Ann. § 357-C:3, I (2000).  An action is arbitrary under the Act if it is "selected at random and without reason." Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 63 (1st Cir. 1992) (construing Maine's Motor Vehicle

-16-

Franchise Act) (internal citations and quotations omitted); see also Appeal of Bd. of Trustees of Univ. Sys. of N.H. for Keene State College, 129 N.H. 632, 636 (1987) ("[t]he common meaning of arbitrary is a decision based on random or convenient selection or choice rather than on reason") (internal citations and quotations omitted).

Colonial argues that Volvo violated the Motor Vehicle Franchise Act by arbitrarily: (1) using subjective surveys to determine a dealer's eligibility for PFE awards; (2) hiring an unqualified contractor to conduct the surveys; and (3) un-reasonably denying Colonial's appeal.[9]

## 1.   The CSI Scores

I reject Colonial's claim that Volvo arbitrarily used subjective and manipulable customer satisfaction surveys to determine a dealer's eligibility for PFE awards. Many automobile manufacturers and distributors use surveys to measure customer

---

[9] Colonial has failed to produce any evidence to support its contentions that Volvo's actions were "unconscionable" or that it acted in "bad faith." Nor does it contend that Volvo terminated it without "good cause" in violation of N.H. Rev. Stat. Ann. § 357-C:3, III (c). See Transcript (hereinafter "Tr.") of Oral Argument on 11/16/2000 (Doc. No. 49), 57-58.

-17-

satisfaction. See Ford Motor Co. v. West Seneca Ford, Inc., No. 91-CV-0784E(F), 1996 WL 685723, at *5 (W.D.N.Y. Jan. 30, 1997); In re: Van Ness Auto Plaza, Inc., 120 B.R. 545, 550 (Bankr. N.D. Cal. 1990). Customer satisfaction is ultimately a subjective opinion, not an objective fact, because only the customer knows whether she truly feels satisfied. See generally Susan J. Becker, Public Opinion Polls and Surveys as Evidence: Suggestions for Resolving Confusing and Conflicting Standards Governing Weight and Admissibility, 70 Or. L. Rev. 463, 516-17 (1991). This subjectivity does not, however, lead inevitably to the conclusion that the use of customer satisfaction surveys is arbitrary. Cf. West Seneca Ford, Inc., 1996 WL 685723, at *5 (stating that distributor was justified in terminating dealer who failed to "achieve a sufficient level of customer satisfaction and service"); In re: Van Ness Auto Plaza, Inc., 120 B.R. at 550 (stating that "it is not beyond the realm of reasonable decisions" for a manufacturer to refuse to accept a dealer with below average CSI). Given the inherently subjective nature of customer satisfaction and its importance to any commercial endeavor, it was not unreasonable for Volvo to base dealer incentives on the results of surveys that attempted to measure

customer satisfaction.

I am also unpersuaded by Colonial's claim that Volvo's use of CSI scores was arbitrary because other dealers manipulated their customers' responses to the surveys or acted in cahoots with Volvo to do so. See Pl.'s Stmt. of Disputed Material Facts, (Doc. No. 42), ¶¶ 21-31. Colonial has failed to identify any evidence to support its assertion that the manipulation of CSI data by other dealers led to its own failure to achieve the requisite CSI ratings for the second half of 1996.[10] Thus, even if such manipulation occurred, Colonial cannot prove that it produced the injury on which it bases its claim.

## 2. **Selection of an Unqualified Survey Firm**

Colonial has also produced insufficient evidence to support its contention that the PFE program was flawed because Volvo

---

[10]  At oral argument, I suggested that perhaps Volvo set the CSI thresholds for the PFE program at an unreasonably high level because of the manipulation of customers' survey responses by other dealers. See Tr. at 26-27. Colonial, however, cannot point to any evidence that reasonably supports that inference. See Tr. at 73-74. I also note that while CSI thresholds for the Dealer of Excellence program changed over time, the record suggests that CSI thresholds for the PFE program remained constant from January 1996, when Colonial entered the program, through at least the end of 1996. See PFE Rules, Section I, Def.'s App. Tab 8, at 1298 (stating that award entry level will be kept constant).

hired an unqualified survey firm to conduct the surveys. While Volvo's survey firm had little or no experience with the automobile industry, it had a long history of measuring and supplying customer satisfaction data to clients in other industries. See Report of Fred Winkel, Senior V.P. of Audits & Surveys, Ex. 6 to Piekarski Aff., ¶¶ 3-5. I cannot accept Colonial's contention that Volvo acted arbitrarily merely because it selected a contractor that had not previously worked in the automobile industry.

### 3. The Appeal

Colonial also argues that Volvo acted arbitrarily by denying Colonial's appeal.[11] To support this claim, it points to Section 1.7 of the PFE rules, which states that a dealer should ask the following question before preparing an appeal: "[h]as a situation occurred which places the [dealer] in an unfair disadvantage? (i.e. natural disasters)." PFE Section II § 1.7. It then argues that Volvo should have granted its appeal because the departure

---

[11] That decision was final according to the PFE rules: "[i]n all appeals and other matters relating to the interpretation and application of any rule or aspect of the [PFE] Program, the decision of Volvo shall be final." PFE Section II § 1.7.

of Lovering and other key employees put Colonial at an unfair disadvantage.

Colonial's argument fails for two reasons. First, it depends upon the flawed premise that Section 1.7 obligates Volvo to grant an appeal whenever a dealer is unable to earn a PFE award because it has been placed at an "unfair disadvantage." Notwithstanding Colonial's contrary assertions, this section of the PFE rules merely lists a series of questions that a dealer must ask itself before preparing an appeal. It does not restrict Volvo's discretion to deny unjustified appeals. Second, even if Colonial had a contractual right to receive PFE payments for the period in question if it could demonstrate that it had been placed at an "unfair disadvantage," it is not entitled to relief because the circumstances it cites to support its appeal do not qualify as an "unfair disadvantage." In an effort to explain what it meant by "unfair disadvantage," Volvo gave as an example "natural disasters." Colonial, in contrast, cited only the loss of several key employees to a competitor as the basis for its appeal. This is hardly the kind of serious unforeseeable difficulty that is akin to a natural disaster. Accordingly, Volvo did not act arbitrarily in denying Colonial's appeal.

## 4.  Conclusion

Construing the evidence in the light most favorable to Colonial, I conclude that no reasonable person could find that Volvo violated the Motor Vehicle Franchise Act.  Accordingly, I grant Volvo's motion for summary judgment with respect to Count II of Colonial's complaint.

## B.  Good Faith and Fair Dealing

Colonial argues that the same conduct discussed above also violated the implied covenant of good faith and fair dealing inherent in the Sales Agreement between Colonial and Volvo.[12]  I analyze this claim using New Hampshire law.[13]

---

[12]  Colonial also alleges that Volvo violated its obligation under the Preamble of the Sales Agreement to "deal fairly" with Colonial and to conduct its business "ethically and equitably".  See Sales Agreement, Def.'s App. Tab 6, Preamble.  I construe the terms of the Preamble as simply an explicit statement of the covenant of good faith and fair dealing implied by law.

[13]  The Sales Agreement provides that it is to be interpreted in accordance with New Jersey law.  My research, however, reveals no material conflict between the law of New Jersey or New Hampshire with regard to the implied covenant of good faith and fair dealing.  Compare Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) with Centronics Corp. v. Genicom Corp., 132 N.H. 133, 143 (1989). Accordingly, I need not reach the issue of whether the Sales Agreement's choice-of-law provision governs Colonial's good faith and fair dealing claim.  See Fratus v. Republic Western Insur. Co., 147 F.3d 25, 28 (1st Cir. 1998); Fashion House, Inc. v. Kmart Corp.,

-22-

In <u>Centronics v. Genicom Corp.</u>, the New Hampshire Supreme Court held:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe <u>reasonable limits</u> in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

132 N.H. at 143 (emphasis added).

I assume, for purposes of analysis, both that the rules of the PFE gave Volvo discretion sufficient to deprive Colonial of a substantial portion of the contract's value and that the Sales Agreement, and by extension, the PFE, created a legally enforceable contract. <u>See</u> <u>id.</u> at 144. Therefore, in determining whether Volvo violated an implied covenant of good faith and fair dealing, I need only consider whether Volvo's actions "exceeded the limits of reasonableness." <u>Id.</u> at 144. The answer to this question, according to the New Hampshire Supreme Court,

> depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations may be measured, and in furtherance of which community standards of honesty, decency and reasonableness can be applied.

892 F.2d 1076, 1092 (1st Cir. 1989).

Id. at 144.

Since I have previously concluded that Volvo did not act arbitrarily or in bad faith in implementing the PFE program and applying it to Colonial, I have little difficulty in determining that Volvo's actions in adopting and administering the PFE program were a reasonable attempt to measure and improve customer satisfaction that fell well within the bounds of community standards of honesty, decency, and reasonableness. See Centronics, 132 N.H. at 144. Therefore, I reject Colonial's claim that Volvo breached its duty of good faith and fair dealing.

C.    **The Consumer Protection Act**

In Count III of its complaint, Colonial alleges that Volvo's conduct violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 et seq. Volvo argues that this claim is barred by § 358-A:3, I, which exempts from the scope of the Consumer Protection Act all "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under [the] statutory authority of [New Hampshire] or of the United States." N.H. Rev. Stat. Ann. § 358-A:3, I (2000).

Relying on <u>Gilmore v. Bradgate Assocs., Inc.</u>, 135 N.H. 234, 238-40 (1992), I previously have held that § 358-A:3, I does not preclude an automobile dealer from bringing a Consumer Protection Act claim against an automobile distributor or manufacturer.  <u>See</u> <u>Ford Motor Co. v. Meredith Motor Co., Inc.</u>, 2000 DNH 187, 23-28 (D.N.H. Aug. 24, 2000); <u>see</u> <u>also</u> <u>Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc.</u>, 148 F.R.D. 25, 47-48 (D.N.H. 1993).  Given the New Hampshire Supreme Court's recent decision overruling <u>Gilmore</u>, <u>see</u> <u>Averill v. Cox</u>, 761 A.2d 1083 (N.H. 2000), I now reassess this conclusion.

In <u>Averill</u>, the New Hampshire Supreme Court reaffirmed its previous holding that the practice of law falls within the scope of the exemption provided by § 358-A:3, I.  761 A.2d at 1087 (reaffirming <u>Rousseau v. Eshleman</u>, 128 N.H. 564, 567 (1986)).  In reaching its holding, the Court: (1) expressly overruled its holding in <u>Gilmore</u> that had limited the reach of § 358-A:3, I to actions that are expressly permitted by a regulatory board or officer; and (2) outlined a new, broader interpretation of § 358-A:3, I.  <u>See</u> <u>id.</u> at 1087-89.

According to <u>Averill</u>, in order for specific trade or commerce to be exempt under § 358-A:3, I, it must be:  (1)

-25-

subject to regulation that is "comprehensive . . . [involving] more than 'mere licensing requirements, approval of plans or declarations, limited trade provisions, and consumer protection prohibitions,'" Averill, 761 A.2d at 1088 (quoting Gilmore, 135 N.H. at 241-42 (Horton, J., concurring)); and (2) "governed by a statutorily authorized regulatory regime that protects consumers from the same deception, fraud, and unfair trade practices as intended by" the Consumer Protection Act. Id. The remedies "available to aggrieved consumers under qualifying regulatory schemes" need not be identical to those provided by the Consumer Protection Act. Id. at 1089. "Rather, it is sufficient that the regulatory scheme protects consumers from fraud and deception in the marketplace 'in a manner calculated to avoid the same ills'" as the Consumer Protection Act. Id. at 1089 (quoting Gilmore, 135 N.H. at 241-42 (Horton, J., concurring)).

The commercial relationship of motor vehicle dealers to distributors, or manufacturers, clearly fits under the first prong of the Averill test. The Motor Vehicle Franchise Act governs all written or oral agreements between motor vehicle distributors, or manufacturers, and dealers. N.H. Rev. Stat.

Ann. § 357-C:6 (2000). It prohibits a broad array of conduct, and goes well beyond mere licensing requirements. See, e.g., N.H. Rev. Stat. Ann. §§ 357-C:3 (prohibited conduct), 358-C:4 (delivery and preparation obligations), 357-C:5 (warranty obligations), 357-C:9 (limitations on establishing or relocating dealerships); see also N.H. Rev. Stat. Ann. § 357-C:12 (creating New Hampshire Motor Vehicle Industry Board to enforce the statute and to adopt rules as necessary).

As for the second prong of Averill, I note that the Motor Vehicle Franchise Act prevents manufacturers or dealers from engaging in "any action which is arbitrary, in bad faith, or unconscionable and which causes damage to [automobile dealers or manufacturers] or to the public." N.H. Rev. Stat. Ann. § 357-C:3. This prohibition encompasses the same "unfair or deceptive act[s] or practice[s]" prohibited by the Consumer Protection Act. See N.H. Rev. Stat. Ann. § 358-A:2.

Accordingly, I conclude that the commercial relationship of motor vehicle dealers to distributors, or manufacturers, falls within the exemption to the Consumer Protection Act provided by § 358-A:3, I. Colonial's Consumer Protection Act claim is

therefore barred; and I grant Volvo's motion for summary judgment with regard to Count III.

## D.  **Tortious Interference**

In Count IV of its complaint, Colonial alleges that Volvo's withholding of PFE payments damaged Colonial's relationship with present and potential customers.  I assume for purposes of analysis that this allegation could potentially give rise to a claim of tortious interference with prospective business relations, but cf. Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 613 (1978) ("a breach of contract standing alone does not give rise to a tort action").

Colonial nevertheless cannot prevail on its tortious interference claim because, as discussed above with regard to Colonial's other claims, no reasonable person could conclude that Volvo acted "wrongfully" in refusing to pay Colonial any PFE awards, either initially or on appeal.  See Montrone v. Maxfield, 122 N.H. 724, 726 (1982) (to prevail on a tortious interference claim, plaintiff must show that defendant "wrongfully" interfered).  Accordingly, I grant Volvo's motion for summary judgment with respect to Count IV of Colonial's complaint.

**E.    Misrepresentation**

Lastly, Colonial alleges that Volvo negligently and/or intentionally misrepresented its intent to honor its contractual obligations toward Colonial under the PFE program.

Under New Hampshire law, a contractual promise can give rise to a claim of misrepresentation only in those extremely rare circumstances where: (1) the promisor breached the contract; and (2) the promisee can show that the promisor had no intent, or no ability, to fulfill the contract at the time that the promisor entered into the contract. See Hydraform Prods. Corp. v. American Steel & Aluminum Corp., 127 N.H. 187, 200 (1985); Malone v. Cemetary Street Dev., Inc., Civ. No. 94-339-B, 1995 WL 85288, at *2 (D.N.H. Feb. 17, 1995); see also Thompson v. H.W.G. Group, Inc., 139 N.H. 698, 701 (1995).  As I have concluded that Volvo did not breach the contract at issue here, I must also conclude that Colonial fails to state a claim for either negligent or intentional misrepresentation.  Accordingly, I grant Volvo's motion for summary judgment as to Counts V and VI of the complaint.

# IV. CONCLUSION

When the evidentiary record is taken in the light most favorable to Colonial it cannot support the claims asserted in Colonial's complaint. Therefore, I grant Volvo's motion for summary judgment, (Doc. No. 39), and direct the clerk to enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 9, 2001

cc: Richard B. McNamara, Esq.
    Irvin D. Gordon, Esq.
    James C. McGrath, Esq.